UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

       Plaintiff,

Case No. 24-cv-12817
and                                    Hon. Brandy R. McMillion
**ASHER LUCAS,**

       Intervenor-Plaintiff,

vs.

**BRIK ENTERPRISES, INCORPORATED,
DBA CULVER'S OF CLARKSTON; DAVISON
HOSPITALITY, INC. DBA CULVER'S OF
DAVISON; FENTON HOSPITALITY INC DBA
CULVER'S OF FENTON; GB HOSPITALITY, INC.
DBA CULVER'S OF GRAND BLANC; BLUE
WATER HOSPITALITY, INC.,**

       Defendants.

---

| | |
|---|---|
| Kenneth L. Bird | Courtney L. Nichols (P75160) |
| EEOC | 38505 Woodward Avenue |
| 101 West Ohio Street | Suite 100 |
| Suite 1900 | Bloomfield Hills, MI 48304 |
| Indianapolis, IN 46204 | (248) 594-6360 |
| (317) 226-7204 | cnichols@plunkettcooney.com |
| kenneth.bird@eeoc.gov | *Attorney for Defendants* |
| *Attorney for Plaintiff* | |
| | |
| Angela M. Mannarino (P72374) | |
| 37637 Five Mile Road #294 | |
| Livonia, MI 48154 | |
| (734) 430-0880 | |
| angela@mannarino-law.com | |
| *Attorney for Intervenor-Plaintiff* | |

## INTERVENOR-PLAINTIFF ASHER LUCAS'S RESPONSE TO PLAINTIFF EEOC'S MOTION TO DISMISS PURSUANT TO FRCP 41(a)(2)

**NOW COMES** Intervenor-Plaintiff, **ASHER LUCAS**, by and through his attorneys, MANNARINO LAW PLLC, who respectfully requests that this Honorable Court deny Plaintiff EEOC's Motion to Dismiss Pursuant to FRCP 41(a)(2) for the reasons set forth herein and as more fully set forth in the attached Brief in Support (incorporated herein by reference).

1. Admitted.

2. Admitted.

3. Denied.

4. Admitted.

**WHEREFORE**, Intervenor-Plaintiff Asher Lucas respectfully requests that this Honorable Court deny Plaintiff EEOC's Motion to Dismiss Pursuant to FRCP 41(a)(2).

Respectfully submitted,

**MANNARINO LAW PLLC**

By:   */s/ Angela Mannarino*
      Angela Mannarino (P72374)
      *Attorneys for Intervenor-Plaintiff*
      37637 Five Mile Road #294
      Livonia, MI 48154
      P: (734) 430-0880
      angela@mannarino-law.com

Dated:  March 10, 2025

ii

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2025, I caused to be electronically filed the foregoing document with the U.S. District Court's Clerk of the Court using the ECF system, which will send notification of such filing to counsel of record.

<u>/s/*Angela Mannarino*</u>
Angela Mannarino

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

        Plaintiff,

                                  Case No. 24-cv-12817

and                                Hon. Brandy R. McMillion

**ASHER LUCAS,**

        Intervenor-Plaintiff,

vs.

**BRIK ENTERPRISES, INCORPORATED,
DBA CULVER'S OF CLARKSTON; DAVISON
HOSPITALITY, INC. DBA CULVER'S OF
DAVISON; FENTON HOSPITALITY INC DBA
CULVER'S OF FENTON; GB HOSPITALITY, INC.
DBA CULVER'S OF GRAND BLANC; BLUE
WATER HOSPITALITY, INC.,**

        Defendants.

---

## <u>INTERVENOR-PLAINTIFF ASHER LUCAS'S BRIEF IN SUPPORT OF RESPONSE TO PLAINTIFF EEOC'S MOTION TO DISMISS PURSUANT TO FRCP 41(a)(2)</u>

iv

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................. v

ISSUES PRESENTED ................................................................................. vi

INDEX OF AUTHORITIES ........................................................................ vii

STATEMENT OF FACTS ............................................................................. 1

    I.   The Equal Employment Opportunity Commission ...................................... 1

        a. EEOC Enforcement Policies .................................................................. 1

        b. EEOC Charge of Discrimination Processing ........................................... 2

        c. Legal Actions by the EEOC ................................................................... 3

    II.  Procedural History ................................................................................ 4

        a. Asher Lucas Files a Charge of Discrimination with the EEOC .............. 4

        b. The EEOC Files Suit and Lucas Intervenes ........................................... 4

STANDARD OF REVIEW ........................................................................... 5

LAW AND ARGUMENT ............................................................................. 5

        a. Lucas Will Suffer Plain Legal Prejudice if the EEOC Motion is Granted
        ...................................................................................................... 6

        b. Dismissal Under Rule 41(a)(2) is Inappropriate ..................................... 7

RELIEF REQUESTED ................................................................................. 8

## <u>ISSUES PRESENTED</u>

1.  Should this Honorable Court deny Plaintiff's Motion to Dismiss where Intervenor-Plaintiff will suffer prejudice and where the EEOC does not seek dismissal of the "action"?

    | | |
    |---|---|
    | Intervenor-Plaintiff answers: | "Yes" |
    | Plaintiff would answer: | "No" |
    | This Honorable Court should answer: | "Yes" |

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Blakenship v. Pikeville Med. Ctr., Inc.*, No. CV 7:24-10-KKC, 2024 WL 4369882 (E.D. Ky. Oct. 1, 2024)..........................................................................................8

*Blue Bell Boots, Inc. v. EEOC*, 418 F.2d 355 (6th Cir.1969) ...................................3

*Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc.*, 583 F.3d 948 (6th Cir. 2009)......................................................................................................................5

*County of Santa Fe v. Pub. Serv. Co. (Santa Fe County)*, 311 F.3d 1031 (10th Cir. 2002)......................................................................................................................6

*DRFP, LLC v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890 (S.D. Ohio 2013)......................................................................................................................8

*E.E.O.C. v. Nw. Airlines, Inc.*, 188 F.3d 695 (6th Cir. 1999)...................................4

*General Tel. Co. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) .3

*Grover v. Eli Lilly & Co.*, 33 F.3d 716 (6th Cir. 1994) ........................................5, 6

*Logan v. MGM Grand Detroit Casino*, 939 F.3d 824 (6th Cir. 2019) .....................3

*Pedreira v. Sunrise Children's Servs., Inc.*, 79 F.4th 741 (6th Cir. 2023)...........5, 6

*Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782 (6th Cir. 1961) ...............................7

*Rosell v. VMSB, LLC*, 67 F.4th 1141 (11th Cir. 2023) .............................................8

*SAAP Energy v. Greenwich Ins. Co.*, No. 1:12-CV-00098-TBR, 2014 WL 12726322 (W.D. Ky. May 21, 2014)......................................................................................7

**Statutes**

42 U.S.C. § 2000e-5(e) ..............................................................................................2

42 U.S.C. § 2000e–5(f)(1) .........................................................................................3

**Regulations**

29 C.F.R. §§ 1601.19(a)............................................................................................3

29 C.F.R.§ 1601.28(b) ..............................................................................................3

## STATEMENT OF FACTS

I.   **The Equal Employment Opportunity Commission**

a.   **EEOC Enforcement Policies**

The Equal Employment Opportunity Commission (hereinafter "EEOC") is a federal agency entrusted by Congress "with the responsibility of enforcing the nation's employment anti-discrimination laws. These laws reflect Congress' vision of equal opportunity in our nation's workplaces. To honor the trust that has been given us, we must have an unwavering commitment to carrying out that vision." Exhibit A, EEOC Strategic Plan, p. 2. "[T]he EEOC is accountable to the public it serves." *Id.* According to the EEOC, it "has an obligation to be impartial as it investigates charges in the private sector and adjudicates cases in the federal sector. If we conclude that unlawful discrimination has occurred, we have an obligation to advance the public interest and work to remedy the harm caused by discrimination." *Id.*

The EEOC, in its Strategic Enforcement Plan for 2024-2028 stated its objective to "focus on harassment, retaliation, job segregation, labor trafficking, discriminatory pay, disparate working conditions, and other policies and practices that impact particularly vulnerable workers" including, but not limited to, LGBTQI+ employees. Exhibit B, SEP, p. 9. Pursuant to the EEOC's website, "[s]ex discrimination involves treating someone (an applicant or employee) unfavorably because of that person's sex, including the person's sexual orientation, transgender

1

status, or pregnancy. Discrimination against an individual because of sexual orientation or transgender status is discrimination because of sex in violation of Title VII." (https://www.eeoc.gov/sex-based-discrimination (last accessed March 10, 2025)).

In addition to seeking relief for the aggrieved parties, the EEOC also focuses on relief to the public at large. Exhibit C, Standards and Procedures, pp. 7-11. This relief takes the form of injunctions, training, and other targeted equitable relief. *Id.*

### b. EEOC Charge of Discrimination Processing

A person initiates the EEOC investigation into a violation of Title VII by filing a Charge of Discrimination with the EEOC within 300 days of the alleged discrimination. 42 U.S.C. § 2000e-5(e). The EEOC then investigates the Charge of Discrimination.

The EEOC will issue the complaining employee a right-to-sue letter if the agency makes one of the following four determinations: (1) where the EEOC determines that "there is not reasonable cause to believe that an unlawful employment practice has occurred," (2) where the EEOC determines that a violation has occurred, and that the employer refuses to enter into a conciliation agreement, and the EEOC decides not to pursue a civil action against the employer, (3) where the EEOC has entered into a conciliation agreement but the complaining employee has not entered into the conciliation agreement, or (4) where the charge is dismissed.

*Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 828 (6th Cir. 2019) citing 29 C.F.R. §§ 1601.19(a), 1601.28(b).

### c. Legal Actions by the EEOC

"Congress granted the EEOC the discretion, upon a finding of reasonable cause, to supplant an individual's legal action by a legal action of its own, for the benefit of the public and the individual on whose behalf the EEOC is proceeding, thereby superseding the individual's right to sue under Title VII." *E.E.O.C. v. Frank's Nursery & Crafts, Inc.,* 177 F.3d 448, 468 (6th Cir. 1999). Title VII "bars an aggrieved individual from ever bringing such a suit should the EEOC choose to sue on its own. In such cases, the only right Title VII reserves to an aggrieved individual is the right to intervene in the EEOC's action. See 42 U.S.C. § 2000e–5(f)(1) (1998)." *Id.* at 456 (6th Cir. 1999).

The "EEOC is not merely a proxy for the victims of discrimination" and that "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *Id.* at 458 (6th Cir. 1999) quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 322, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). While seeking enforcement of Title VII, the EEOC may "in the public interest, provide relief which goes beyond the limited interests of the charging parties." *Frank's Nursery* at 458 (6th Cir. 1999) quoting *Blue Bell Boots, Inc. v. EEOC*, 418 F.2d 355, 358 (6th Cir.1969).

3

> [W]hen the EEOC seeks equitable relief for a group of employees, it need not demonstrate the existence of a class. See *Frank's Nursery*, 177 F.3d at 467. "[T]he EEOC may obtain such general injunctive relief, under the equitable discretion of the district court, even where the EEOC only identifies one or a mere handful of aggrieved employees." *Id.* at 467–68 (citing *EEOC v. Monarch Mach. Tool Co.*, 737 F.2d 1444, 1449 (6th Cir.1980)). The EEOC need not demonstrate or allege a pattern or policy of discrimination in order to obtain a permanent injunction. *Id.* at 468.

*E.E.O.C. v. Nw. Airlines, Inc.*, 188 F.3d 695, 702 (6th Cir. 1999).

## II.  Procedural History

### a.  Asher Lucas Files a Charge of Discrimination with the EEOC

On or about November 15, 2022, Intervenor-Plaintiff Asher Lucas (hereinafter "Lucas") filed a Charge of Discrimination with the EEOC. Exhibit D. Lucas alleged that he was discriminated and retaliated against by the Defendants because he is transgender. Specifically, Lucas was misgendered and deadnamed by a co-worker. Lucas objected to this conduct to the co-worker and complained to his employer about the coworker's conduct. Because Lucas objected and complained, Defendants terminated his employment.

After Lucas filed his Charge of Discrimination, the EEOC investigated. Ultimately, the EEOC issued a finding that there was reasonable cause to believe that Defendants violated Title VII. Exhibit E.

### b.  The EEOC Files Suit and Lucas Intervenes

On or about October 25, 2024, the EEOC filed the Complaint in this matter initiating this litigation. ECF No. 1. In its Complaint, the EEOC sought both

4

monetary and equitable relief. On or about November 7, 2024, Intervenor-Plaintiff Asher Lucas filed his Motion to Intervene. ECF No. 7. This Court subsequently granted Lucas's Motion to Intervene and filed his Complaint on or about January 2, 2025. ECF Nos. 18 and 19.

On or about February 24, 2025, the EEOC filed its Motion to Dismiss after Defendants concurred in the relief sought and Lucas did not. ECF No. 27.

### STANDARD OF REVIEW

Fed.R.Civ.P. 41(2) provides, in relevant part, that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."

### LAW AND ARGUMENT

"A court's primary consideration in ruling on a Rule 41(a)(2) motion is to protect the nonmoving party from unfair treatment." *Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc*., 583 F.3d 948, 953 (6th Cir. 2009) citing *Grover v. Eli Lilly & Co*., 33 F.3d 716, 718 (6th Cir. 1994). Unfair treatment is defined as "plain legal prejudice". *Grover* at 718 (6th Cir. 1994).

"Although it is unlikely that dismissing an action with prejudice might so unfairly affect a defendant that a voluntary motion for such dismissal should be denied, there may be rare cases in which dismissal with prejudice adversely affects the interests of defendants or third parties in a way that causes them plain legal prejudice." *Pedreira v. Sunrise Children's Servs., Inc.*, 79 F.4th 741, 751 (6th Cir. 2023)(internal citations omitted).

### a. Lucas Will Suffer Plain Legal Prejudice if the EEOC Motion is Granted

In determining whether a defendant will suffer plain legal prejudice, a court should consider such factors as the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant.

*Grover* at 718 (6th Cir. 1994)(citations omitted). Here, the Defendants concurred in the relief sought by the EEOC and do not oppose the EEOC's Motion. The parties who are at risk are Lucas and the other named Charging Parties. "[T]here will be circumstances where granting [the motion] may adversely affect the defendant or, more likely, other parties to the litigation." *Pedreira v. Sunrise Children's Servs., Inc.*, 79 F.4th 741, 749–50 (6th Cir. 2023) citing *County of Santa Fe v. Pub. Serv. Co. (Santa Fe County)*, 311 F.3d 1031, 1049 (10th Cir. 2002).

This is one of the rare cases. In this matter, the EEOC is seeking to abandon pursuing a case it filed pursuant to an interpretation of an Executive Order. Nothing has changed in this case since the EEOC filed the litigation. There has been no factual development in discovery that has impaired the claims which would justify the EEOC's Motion to Dismiss. The only reason the EEOC relies on is the Executive Order.

Notably, the EEOC's Motion states that its "continued litigation of the claims in this action **<u>may</u>** be inconsistent" with the Executive Order and its interpretation. ECF No. 26 (emphasis added). The EEOC does not allege or rely on any authority

6

to substantiate that the EEOC's continued pursuit runs afoul of the Executive Order, that the EEOC is required to seek dismissal, or that the Executive Order governs the EEOC's conduct. The EEOC's explanation is wholly insufficient for asking this Court to approve the EEOC's abandonment of transgender employees like Lucas and dismiss the EEOC's claims in this action.

The EEOC, pursuant to Title VII, its Enforcement Policies, its Strategic Plan, and its Strategic Enforcement Plan, has an obligation to pursue cases where it has found discrimination, such as this one. The Executive Order referenced by the EEOC seeks to override the authority granted to the EEOC by Congress to enforce federal discrimination laws. The EEOC seeking to discontinue pursuing this case is tantamount to sanctioning the discrimination and retaliation present in this case. The EEOC's withdrawal in this case will irreparably prejudice Lucas.

As the EEOC acts on behalf of not only aggrieved employees like Lucas but the public at large, it has access to broader injunctive relief and more significant relief than Lucas does acting alone. He (and the other aggrieved employees) would be prejudiced by the loss of potential remedies in this case.

### b. Dismissal Under Rule 41(a)(2) is Inappropriate

"The Sixth Circuit stated 'action' as used in Rule 41 means the 'entire controversy' and not a 'claim' or 'cause of action.'" *SAAP Energy v. Greenwich Ins. Co.*, No. 1:12-CV-00098-TBR, 2014 WL 12726322, at *4 (W.D. Ky. May 21, 2014) quoting *Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961).

7

Therefore, "as a procedural matter, a Rule 41(a)(2) voluntary dismissal can only be used to dismiss an entire action, not specific claims." *Blakenship v. Pikeville Med. Ctr., Inc*., No. CV 7:24-10-KKC, 2024 WL 4369882, at *1 (E.D. Ky. Oct. 1, 2024) citing *DRFP, LLC v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 904 (S.D. Ohio 2013); *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023) ("a Rule 41(a)(2) dismissal can only be for an entire action, and not an individual claim."). Here, as this Court has granted Lucas's Motion to Intervene, Lucas has asserted his own claims, and the EEOC is only moving to dismiss its claims not the entire action, dismissal pursuant to Fed.R.Civ.P. 41(a)(2) is inappropriate.

## **RELIEF REQUESTED**

Intervenor-Plaintiff Asher Lucas respectfully requests that this Honorable Court deny Plaintiff EEOC's Motion to Dismiss Pursuant to FRCP 41(a)(2).

Respectfully submitted,

**MANNARINO LAW PLLC**

By:     */s/ Angela Mannarino*
Angela Mannarino (P72374)
*Attorneys for Intervenor-Plaintiff*
37637 Five Mile Road #294
Livonia, MI 48154
P: (734) 430-0880
angela@mannarino-law.com

Dated:  March 10, 2025

8

# EXHIBIT A

**U.S. Equal Employment Opportunity Commission**

# EEOC Strategic Plan 2022–2026

# Table of Contents

**Message from the Commission**

**Introduction**

**The Strategic Planning Process**

**About the EEOC**

**Mission and Vision Statements**

**The EEOC FY 2022-26 Strategic Plan Crosswalk**

**Strategic Goal I**

**Strategic Goal II**

**Strategic Goal III**

**External Factors Affecting the Achievement of the Strategic Plan**

**Program Evaluations**

**Acknowledgements**

**Appendix A – Strategic Plan National Workgroup**

**Appendix B – Performance Measures**

# Message from the Commission

The United States Equal Employment Opportunity Commission ("EEOC," "agency," or "Commission") is pleased to release the agency's Strategic Plan for Fiscal Years 2022-2026. This Strategic Plan will guide the agency as we fulfill our mission of preventing and remedying unlawful employment discrimination and advancing equal employment opportunity for all. The work of the Commission depends on the daily efforts of over 2,100 dedicated personnel, located in its headquarters and 53 field offices across the nation, along with our federal, state, local and Tribal partners. In creating the Strategic Plan, we sought input from the EEOC's workforce in addition to the agency's leadership. We also solicited and received comments from a wide range of stakeholders and the public. As a result, the plan is a true reflection of the agency and all those who have a stake in our mission.

The Strategic Plan is guided by three values that form the basis of our agency culture and guide our daily work:

- Commitment to Equal Employment Opportunity

- Accountability

- Integrity

**Commitment to Equal Employment Opportunity:** Congress entrusted the Commission with the responsibility of enforcing the nation's employment anti-discrimination laws. These laws reflect Congress' vision of equal opportunity in our nation's workplaces. To honor the trust that has been given us, we must have an unwavering commitment to carrying out that vision.

**Accountability:** Like all federal agencies, the EEOC is accountable to the public it serves. We must therefore continue to demand excellence in ourselves and have systems in place to hold us accountable. To this end, the Commission must ensure that the resources entrusted to us are used to advance the agency's mission, that the EEOC workforce has adequate training, and that the agency consistently implements effective processes that are periodically evaluated and updated, as appropriate.

**Integrity:** The Commission has an obligation to be impartial as it investigates charges in the private sector and adjudicates cases in the federal sector. If we conclude that unlawful discrimination has occurred, we have an obligation to advance the public interest and work to remedy the harm caused by discrimination. Moreover, every person we serve or with whom we interact in the performance of our duties and every member of the EEOC workforce is entitled to be treated with respect, courtesy, and professionalism.

In keeping with these values, the Strategic Plan builds on the Commission's successes and challenges us to do more. It requires us to take a critical look at what we have accomplished and explore where there is room to improve. The plan prioritizes a coordinated, holistic approach to

preventing discrimination and enforcing the law, recognizing that while external factors outside of the agency's control may impact the EEOC's yearly progress, we must continue to steadfastly pursue our mission in service to the American public.

# Introduction

Equal opportunity for all is one of our nation's most cherished and hard-fought values. Since 1965, the United States Equal Employment Opportunity Commission ("EEOC," "agency," or "Commission") has been the leading federal law enforcement agency dedicated to preventing and remedying employment discrimination and advancing equal opportunity for all in the workplace. The Strategic Plan for Fiscal Years 2022-2026 ("Strategic Plan") establishes a framework for achieving the EEOC's mission to "prevent and remedy unlawful employment discrimination and advance equal employment opportunity for all," so that the nation might realize the Commission's vision of "fair and inclusive workplaces with equal opportunity for all."

To accomplish this mission and realize this vision, the EEOC will pursue the following strategic goals and objectives:

1. **Combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities.** The corresponding objectives are: 1) The agency has a broad impact on preventing and remedying employment discrimination while providing meaningful relief for victims of discrimination; and 2) The agency exercises its enforcement authority fairly, efficiently, and based on the circumstances of each charge or complaint.

2. **Prevent employment discrimination and advance equal employment opportunities through education and outreach.** The corresponding objectives are: 1) Members of the public are aware of employment anti-discrimination laws, EEOC enforcement actions, and know their rights and responsibilities under these laws; and 2) Employers, federal agencies, unions, and staffing agencies have the information and guidance necessary to advance equal employment opportunity, prevent discrimination, and effectively resolve EEO issues.

3. **Strive for organizational excellence through our people, practices, and technology.** The corresponding objectives are: 1) The EEOC achieves a culture of accountability, inclusivity, and accessibility; and 2) Resources align with priorities to strengthen intake, outreach, education, enforcement, and service to the public to protect and advance civil rights in the workplace.

The plan also presents clear and realistic strategies for achieving each of the three strategic goals and identifies 15 performance measures (with appropriate interim targets[1]) to track the EEOC's

progress as it approaches FY 2026.

# The Strategic Planning Process

The Government Performance and Results Act  Modernization Act requires executive departments, government corporations, and independent agencies to develop and post a Strategic Plan on their public websites every four fiscal years. The plan must include at least the following:

- A mission statement covering the major functions and operations of the agency;

- General goals and objectives to achieve those goals;

- A description of how these goals and objectives are to be achieved; and

- An identification of key factors external to the agency and beyond its control that could significantly affect the achievement of its general goals and objectives.

The head of each agency is also required to issue an annual performance plan covering each program activity set forth in the agency's budget. This performance plan is a complement to the agency's strategic plan and establishes performance goals that define the level of performance that will be achieved during the year in which the plan is submitted and the next fiscal year; expresses such goals in an objective, quantifiable, and measurable form; describes how the performance goals will contribute to the general goals and objectives established in the agency's strategic plan; and describes how the performance goals will be achieved. In addition, the performance plan must establish a balanced set of performance indicators to be used in measuring or assessing progress toward each performance goal; provide a basis for comparing actual program results with the established performance goals; describe how the agency will ensure the accuracy and reliability of the data used to measure progress toward its performance goals; and describe major management challenges the agency faces and identify how the agency plans to address them.

The development of a strategic plan and annual performance plans require an agency's leadership to reflect upon the agency's statutory mission, reassess prior goals and objectives, and identify any new goals and objectives that will enable the agency to meet its statutory mission. The plans also inform Congress and the public of key factors external to the agency that may affect the agency's ability to carry out its mandate.

# About the EEOC

The EEOC was created in direct response to the historic 1963 March on Washington for Jobs and Freedom. The agency first opened its doors on July 2, 1965. The mandate and authority of the EEOC was set forth in Title VII of the Civil Rights Act of 1964 and expanded in later laws enacted by Congress. Over nearly six decades, our jurisdiction has grown and now includes the following statutes:

- **Title VII of the Civil Rights Act of 1964 (Title VII),** as amended, prohibits employment discrimination based on race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), and national origin.

- **The Age Discrimination in Employment Act of 1967 (ADEA),** as amended, prohibits employment discrimination against workers age 40 and older.

- **The Pregnancy Discrimination Act of 1978 (PDA)** amended Title VII to clarify that discrimination based on pregnancy, childbirth, or related medical conditions constitutes sex discrimination and requires employers to treat women affected by pregnancy, childbirth, or related medical conditions the same as any other employees with temporary disabilities with respect to terms and conditions of employment, including health benefits.

- **The Equal Pay Act of 1963 (EPA)** (included in the Fair Labor Standards Act), as amended, prohibits sex discrimination in the payment of wages to men and women performing substantially equal work in the same establishment.

- **Titles I and V of the Americans with Disabilities Act of 1990 (ADA),** as amended, prohibit employment discrimination based on disability by private and state and local government employers. **Sections 501 and 505 of the Rehabilitation Act of 1973** provide the same protections for federal employees and applicants for federal employment.

- **Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA)** prohibits employment discrimination based on an applicant's or employee's genetic information (including family medical history).

- **The Pregnant Workers Fairness Act (PWFA)** requires covered employers to provide reasonable accommodations to a qualified applicant's or employee's known limitations related to pregnancy, childbirth, or related medical conditions, unless the accommodation will cause the employer an undue hardship.

Together, these laws protect individuals from employment discrimination (including unlawful harassment) based on race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), national origin, age, disability, and genetic information. They also make it illegal

to retaliate against a person for opposing employment discrimination, filing a charge of discrimination, or participating in an employment discrimination proceeding. Finally, provisions in the ADA, the Rehabilitation Act, and GINA strictly limit covered entities from obtaining health-related information from applicants and employees and require that any genetic or medical information a covered entity has about an applicant or employee be kept confidential.

Most of these laws apply to private and state and local government employers with 15 or more employees, labor organizations, employment agencies, and the federal government ("covered entities"). (The ADEA applies to state and local governments and to private employers with 20 or more employees; there is no minimum employee requirement under the EPA.) Title VII and Executive Order 12067 also authorize the EEOC to coordinate and lead the federal government's efforts to combat workplace discrimination.

## Leadership and Organization

The Commission is composed of five members, not more than three of whom may be members of the same political party. Members of the bipartisan Commission are appointed by the President and confirmed by the Senate for a set term of five years. The President designates one member of the Commission to serve as Chair. The President also may designate a Vice Chair. The Chair is responsible, on behalf of the Commission, for the administrative operations of the agency.

The EEOC's General Counsel is also appointed by the President and confirmed by the Senate for a term of four years. The General Counsel is responsible for the conduct of litigation pursuant to the agency's statutory authorities.

**EEOC Organizational Structure**



**([https://www.eeoc.gov/eeoc-organizational-structure](https://www.eeoc.gov/eeoc-organizational-structure))**

# Enforcement

**Private and State and Local Government Sectors.** There are two major enforcement mechanisms available to the EEOC in the private and state and local government sectors. The first is the investigation and conciliation (also called the "administrative process") of charges brought by an individual or by a Commissioner alleging discrimination. The second is the litigation process — the bringing of individual, class, and systemic, including pattern or practice, cases, in federal court against a covered entity that the agency believes has violated one or more of the laws the EEOC enforces.

An individual may file a private discrimination lawsuit against a covered entity under the laws enforced by the EEOC; however, the individual must first file a charge of discrimination with the agency. (The person filing a charge is generally known as a "charging party" and the organization against whom the charge is filed is known as a "respondent.") Congress created this administrative exhaustion requirement to provide the EEOC with the opportunity to determine if there is reasonable cause to believe discrimination has occurred and to provide an opportunity for voluntary resolution where possible. A member of the Commission may also file a charge alleging discrimination under Title VII, the ADA, the PWFA, or GINA, known as a Commissioner

Charge. In addition, the EEOC may initiate directed investigations under the EPA and the ADEA. No

charging party is required for a Commissioner Charge or an agency-initiated directed investigation; however, both are filed on behalf of aggrieved individuals.

Since 1995, the EEOC has offered an alternative dispute resolution ("ADR") process to resolve certain charges prior to the initiation of investigation. The respondent and charging party are invited to voluntarily mediate these charges. During mediation, the focus is not on whether the law has been violated, but rather whether the issue can be resolved to the parties' mutual satisfaction. Following a pilot conducted from July 2020 through January 2021, the EEOC adopted procedures that increase flexibility in the process, including the expanded use of virtual mediations, the effectiveness of which was confirmed both during the pilot and through later research.

Charges not resolved in mediation are investigated to determine if there is reasonable cause to believe discrimination has occurred. The EEOC is authorized to issue administrative subpoenas in aid of its investigations. If reasonable cause is found, the agency provides the respondent an opportunity to remedy the discriminatory practice(s) through conciliation.

If the matter is not successfully conciliated, the EEOC generally is authorized to bring a civil action against the respondent in federal court. If, however, the respondent is a state or local employer and the case is under Title VII, the ADA, the PWFA, or GINA, only the U.S. Attorney General is authorized to sue. Thus, if the EEOC's investigation of a charge against a state or local government employer concludes that there is reasonable cause to believe discrimination occurred, the EEOC refers the matter to the Department of Justice. A charging party may also intervene in cases under Title VII, the ADA, the PWFA or GINA where the government pursues litigation. The agency and the Attorney General are also authorized to issue Notices of Right to Sue to charging parties who wish to institute private litigation under Title VII, the ADA, the PWFA, or GINA. Notices of Right to Sue are not necessary for a charging party to file suit under the ADEA or EPA.

Congress also has authorized the agency to cooperate with state and local Fair Employment Practices Agencies (FEPAs), which are responsible for administering state or local fair employment laws, and to enter into agreements with these agencies to undertake investigation and conciliation of charges that would otherwise be investigated and conciliated by the EEOC. The EEOC currently has work sharing agreements with 91 state and local FEPAs.

The agency also partners annually with more than 60 Tribal Employment Rights Offices (TEROs) to promote equal employment opportunity on or near Native American/Alaska Native reservations or tribal lands. In FY 2021, pursuant to Executive Order 13175, for the first time, the EEOC engaged in consultations with Tribal leaders to develop an agency-wide process for consultation and to expand outreach to people on tribal lands to ensure they know their rights under the federal laws EEOC enforces. This outreach goes beyond the contracted TEROs to include all federally recognized tribes.

**Federal Government Sector.** Title VII and other employment anti-discrimination laws guarantee
that personnel actions affecting federal employees or applicants for employment by federal agencies "shall be made free from any discrimination" based on race, color, religion, sex, national origin, age, disability, or genetic information. Federal employees also are protected against retaliation for complaining about discrimination, filing a complaint of discrimination, or participating in an employment discrimination proceeding. The restrictions on the acquisition and disclosure of genetic and other medical information that apply to private and state and local government employers under the ADA and GINA also apply to federal agencies. The EEOC is charged with both adjudicatory and oversight responsibilities regarding this guarantee.

Federal employees or applicants ("complainants") who believe they have been subjected to unlawful employment discrimination must first contact their agency's equal employment opportunity ("EEO") counselor, who will provide them with the choice of participating either in EEO counseling or in a federal alternative dispute resolution program. If the matter is not settled during counseling or through ADR, the complainant may file a formal complaint with their agency's EEO office, and the agency must investigate if it determines the complaint meets jurisdictional and other requirements. While the investigatory processes of an agency are governed by procedural regulations issued by the EEOC, an agency has full control over the investigation itself.

After the investigation, the complainant is given the option of requesting a hearing with an EEOC administrative judge (AJ) or receiving a final decision from the agency. If the complainant chooses a hearing, the AJ will review the claim and issue a decision. The agency must then take final action on the complaint by issuing a Final Order implementing the AJ's decision or, if it disagrees with the AJ's decision, appealing the decision to the EEOC's Office of Federal Operations.

If the complainant chooses not to request a hearing, the agency, not the EEOC, will issue a Final Agency Decision ("FAD") on the merits of the complaint. If the complainant is dissatisfied with either the AJ's decision or the FAD issued by the agency, the complainant may file an appeal with EEOC's Office of Federal Operations. If either party files an appeal, the EEOC Office of Federal Operations will review the AJ or agency decision, make a formal determination, and issue a final decision. Complainants may pursue their claims in federal court if a final decision is not issued within 180 days of the date their complaint or the EEOC appeal was filed.

The EEOC is authorized to provide appropriate remedies to a federal complainant, including reinstatement, back pay, and damages. Relief ordered by the EEOC is binding on an agency, except in limited circumstances, and an agency may not appeal an adverse decision in federal court. A federal complainant may file a lawsuit in federal court if the complainant receives an adverse decision from the EEOC.

The EEOC also has oversight responsibilities in the federal sector, with the authority to review, approve, and evaluate federal agency EEO plans and affirmative action programs and to review and evaluate the operation of all federal agency EEO programs. The EEOC conducts

comprehensive reviews of federal agencies' EEO programs and their progress toward attaining model EEO status under Management Directive 715. Each review is tailored to the individual agency's situation and may include a written workforce analysis by race, sex, national origin, and disability. A review also aids in identifying barriers to equal opportunity at an agency and helps formulate plans to eliminate such barriers. The program evaluations may be conducted on site and may result in remedial recommendations and a schedule of compliance reports.

## Education and Outreach

In addition to administrative and legal enforcement, the EEOC is required to provide technical assistance and training regarding the laws and regulations it enforces. The EEOC fulfills this mandate in the private, state and local government, and federal sectors by conducting no-cost and fee-based outreach and technical assistance education programs. The EEOC also issues a range of resources, including guidance approved by the Commission, technical assistance documents, and digital media that explain existing legal requirements in non-technical language.

# Mission and Vision Statements

**THE EEOC'S MISSION IS TO:**

Prevent and remedy unlawful employment discrimination and advance equal employment opportunity for all.

**THE EEOC'S VISION IS:**

Fair and inclusive workplaces with equal opportunity for all.

# The EEOC FY 2022–26 Strategic Plan Crosswalk

| OBJECTIVE | STRATEGY | PM[2] |
|-----------|----------|-------|

| **Strategic Goal I** | *I.A.*: The agency has a broad impact on preventing and remedying employment discrimination while providing meaningful relief for victims of discrimination. | *I.A.1*: Rigorously and consistently implement the Strategic Enforcement Plan (SEP) to focus resources on EEOC priorities, integrating agency responsibilities and activities. | 3, 3a, 3b, 3c |
|---|---|---|---|
| | | *I.A.2*: Use administrative and litigation mechanisms to identify and eradicate discriminatory policies and practices, including systemic practices. | 1, 2 |
| | | *I.A.3*: Use the EEOC's decisions and oversight activities to eradicate discriminatory policies and practices in federal agencies. | 4, 5 |
| | | *I.A.4*: Seek effective remedies to end discriminatory practices and deter future discrimination. | 4, 4a |
| | | *I.A.5*: Seek remedies that provide meaningful relief to individual victims of discrimination. | 1, 4 |
| | *I.B.*: The agency exercises its enforcement authority fairly, efficiently, and based on the circumstances of each charge or complaint. | *I.B.1*: Rigorously and consistently implement charge management for private sector and state and local government charges, aligned with the SEP. | 6, 6b, 7, 7a, 7b |
| | | *I.B.2*: Rigorously and consistently implement case management for federal sector hearings and appeals aligned with the SEP. | 6, 6a |
| **Strategic Goal II** | *II.A.*: Members of the public are aware of employment discrimination laws and EEOC enforcement actions and know their rights and responsibilities under these laws. | *II.A.1*: Leverage technology and use innovative strategies to expand EEOC's reach to diverse populations. | 8, 10 |
| | | *II.A.2*: Target outreach to vulnerable workers and underserved communities. | 8, 9, 10 |
| | *II.B.*: Employers, federal agencies, unions, and staffing agencies have the | *II.B.1*: Leverage technology and media to expand EEOC's reach to employers and other covered entities and to ensure | 8, 11 |

| | | | |
|---|---|---|---|
| | necessary to advance equal employment opportunity, prevent discrimination, and effectively resolve EEO issues. | broad awareness of EEOC's litigation and other enforcement efforts, to the extent they may be made public. | |
| | | *II.B.2*: Promote promising practices that employers can adopt to prevent discrimination in the workplace. | 9 |
| | | *II.B.3*: Target outreach to small, new, and disadvantaged/underserved employers. | 9 |
| | | *II.B.4*: Foster partnerships linking federal agencies to shared EEO resources and services. | 11 |
| | **Correlated Strategies** | *II.A.3/II.B.5*: Provide up-to-date, accessible guidance and training on the requirements of employment discrimination laws. | 10 |
| | | *II.A.4/II.B.6*: Increase the knowledge of targeted audiences through focused, innovative collaborations with internal and external stakeholders. | 8, 9 |
| | | *II.A.5/II.B.7*: Provide the infrastructure needed to support the development and delivery of online outreach and education. | 8, 10 |
| | | *II.A.6/II.B.8*: Ensure support services that promote the accessible delivery of outreach and education. | 8, 10 |
| **Strategic Goal III** | *III.A.*: The EEOC achieves a culture of accountability, inclusivity, and accessibility. | *III.A.1*: Recruit, develop, and retain talented employees. | 12 |
| | | *III.A.2*: Advance performance management to maximize organizational improvement. | 13 |
| | | *III.A.3*: Enhance diversity, equity, inclusion, and accessibility in the workplace. | 12 |
| | | *III.A.4*: Develop and support innovation and collaboration to advance employee engagement and morale. | 12 |

| | | *III.A.5*: Promote a culture of continuous improvement. | 12-13 |
|---|---|---|---|
| | | *III.A.6*: Foster constructive employee and labor management relations. | 12 |
| | | *III.A.7*: Strive to be a model employer and to promote equal employment opportunity. | 12 |
| | | *III.A.8*: Develop and implement a robust leadership and succession plan. | 12 |
| | *III.B.*: Resources align with priorities to strengthen intake, outreach, education, enforcement, and service to the public to protect and advance civil rights in the workplace. | *III.B.1*: Expand the use of technology to better serve the public and improve productivity. | 13 |
| | | *III.B.2*: Leverage the use of data, analytics, and information management to support, evaluate, and improve the agency's programs and processes. | 13, 14 |
| | | *III.B.3*: Prioritize and actively manage available fiscal resources to best achieve the agency's mission. | 15 |

# Strategic Goal I

**COMBAT AND PREVENT EMPLOYMENT DISCRIMINATION THROUGH THE STRATEGIC APPLICATION OF EEOC'S LAW ENFORCEMENT AUTHORITIES**

Strategic Goal I, to combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities, reflects the EEOC's primary mission of preventing unlawful employment discrimination through: 1) the administrative (investigation and conciliation) and litigation enforcement mechanisms applicable to private employers, labor organizations, employment agencies, and state and local government employers, that Congress entrusted to the EEOC; and 2) the adjudicatory and oversight mechanisms for federal employers that Congress entrusted to the EEOC.

There are two objectives for Strategic Goal I:

**Strategic Objective I.A.:** The agency has a broad impact on preventing and remedying employment discrimination while providing meaningful relief for victims of discrimination.

**Strategic Objective I.B.:** The agency exercises its enforcement authority fairly, efficiently, and based on the circumstances of each charge or complaint.

Case 2:24-cv-12817-BRM-CI   ECF No. 32, PageID.259   Filed 03/10/25   Page 30 of 105

# Strengthening the Capacity of the Agency in the Private, Public, and Federal Sectors

In the past three years, the EEOC has received an annual average of approximately 67,400 private sector charges of discrimination,[3] more than 8,300 requests for federal sector hearings, and 4,300 requests for federal sector appeals.[4] The large number of individual charges of discrimination and federal sector requests for hearings and appeals that the EEOC receives requires the EEOC to think strategically about how to allocate its resources to ensure the strongest impact possible in its efforts to stop unlawful employment discrimination.

Since at least 1995, the Commission has categorized charges for priority handling based on the likelihood of an investigation resulting in a finding of reasonable cause to believe that discrimination has occurred. Charge prioritization is a continuous process that occurs throughout the life of a charge; in each case, the investigation should be appropriate to the charge, considering the EEOC's resources. In 1996, the Commission adopted a National Enforcement Plan ("NEP") and required District Offices to develop Local Enforcement Plans. The NEP worked in tandem with Priority Charge Handling Procedures (PCHP) so that agency investigators and litigators could focus their resources strategically.

Building on the NEP, in 2000, the Commission developed a Comprehensive Enforcement Program that created best practices for the internal administrative processing of the agency. In December 2012, the NEP was replaced by the Commission's Strategic Enforcement Plan for Fiscal Years 2013-2016, which established the Commission's substantive area priorities and strategies and integrated these priorities into PCHP.

## The Commission's Systemic Program

In 2006, the Commission adopted its Systemic Initiative, now known as its Systemic Program[5]. This initiative made the identification, investigation, and litigation of systemic discrimination cases (pattern or practice, policy, and/or class cases where the alleged discrimination has a broad impact on an industry, profession, company, or geographic area) a top priority. The Systemic Initiative also ensured that the EEOC had a coordinated, strategic, and effective approach to such cases. The Initiative required the agency to effectively use its administrative and litigation tools – including Commissioner Charges, directed investigations, and the strategic use of empirical data – to identify and stop discriminatory policies and other instances of systemic discrimination. After conducting a review of the EEOC's systemic work over a ten-year period, on July 7, 2016, the Commission issued a report on its assessment of that work, "Advancing Opportunity: A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission."[6]  The report

reviewed the highlights and lessons learned from the agency's successes and challenges
Case 2:24-cv-12817-BRM-CI ECF No. 32, PageID.260 Filed 03/10/25 Page 31 of 105
following the 2006 Systemic Task Force Report.

## Establishing Substantive Area Priorities Using the Strategic Enforcement Plan

In December 2012, the Commission issued a Strategic Enforcement plan ("SEP") for Fiscal Years 2013-2016 as a successor to the 1996 NEP. The SEP established substantive area priorities and set forth strategies to integrate the EEOC's private, public, and federal sector activities to have a sustained impact in advancing equal employment opportunity. The Commission reaffirmed its substantive area priorities with some modifications in the Fiscal Year 2017-2021 SEP.**[7]** The EEOC is in the process of updating the SEP for Fiscal Years 2023-2027.

The EEOC's strategies for achieving Strategic Objective I.A. are:

*Strategy I.A.1*: Rigorously and consistently implement the SEP to focus resources on EEOC priorities, integrating agency responsibilities and activities.

*Strategy I.A.2*: Use administrative and litigation mechanisms to identify and eradicate discriminatory policies and practices, including systemic practices.

*Strategy I.A.3*: Use the EEOC's decisions and oversight activities to eradicate discriminatory policies and practices in federal agencies.

*Strategy I.A.4*: Seek effective remedies to end discriminatory practices and deter future discrimination.

*Strategy I.A.5*: Seek remedies that provide meaningful relief to individual victims of discrimination.

The strategies for achieving Strategic Objective I.B. are:

*Strategy I.B.1*: Rigorously and consistently implement charge management for private sector and state and local government charges, aligned with the SEP.

*Strategy I.B.2*: Rigorously and consistently implement case management for federal sector hearings and appeals aligned with the SEP.

## Performance Measures for Strategic Goal 1, Strategic Objectives I.A. and I.B.

The EEOC developed seven performance measures, four of which have corresponding sub-measures, to track its progress in achieving its strategic objectives for Strategic Goal I.

**Performance Measure 1 for Strategic Objective I.A.:** By FY 2025, 90% of EEOC conciliations and litigation resolutions contain targeted, equitable relief and that level is maintained through FY 2026.

| FY 2022 | .86-88%. |
|---------|----------|
| FY 2023 | Increase target to 87-89%. |
| FY 2024 | Increase target to 88-90%. |
| FY 2025 | Maintain target of 90%. |
| FY 2026 | Maintain target of 90%. |

An important activity undertaken by the EEOC is negotiating resolutions of charges after an investigation has determined there is reasonable cause to believe that unlawful employment discrimination has occurred. It is neither appropriate nor feasible to set a target for the number of reasonable cause determinations the agency makes, because every investigation is dependent on the facts of the case. However, it is appropriate to set an objective for the type of relief that should be sought in case resolutions once reasonable cause has been found.

Performance Measure 1 is designed to encourage the EEOC to seek relief that goes beyond monetary damages for individual victims of discrimination. While it is vital that the EEOC seeks meaningful relief for individuals, the Commission's ultimate goal must be to protect all employees and jobseekers from unlawful discriminatory practices.

Targeted, equitable relief includes any non-monetary and non-generic relief that explicitly addresses the discriminatory employment practices at issue in the case, and which provides remedies to the aggrieved individuals or prevents similar violations in the future. Such relief may include customized training for supervisors and employees, development of policies and practices to deter future discrimination, and external monitoring of employer actions, as appropriate.

**Performance Measure 2 for Strategic Objective I.A.:** In each year through FY 2026, the EEOC continues to favorably resolve at least 90% of enforcement lawsuits.

| FY 2022 | Maintain target of 90%. |
|---------|--------------------------|
| FY 2023 | Maintain target of 90%. |
| FY 2024 | Maintain target of 90%. |
| FY 2025 | Maintain target of 90%. |
| FY 2026 | Maintain target of 90%. |

Performance Measure 2 places a premium on maintaining the high level of successful resolutions in the EEOC's litigation program. Successful resolutions include cases decided by favorable court order and those concluded through a consent decree or a settlement agreement in litigation. Achieving success on this measure will ensure that the EEOC continues to exercise its prosecutorial discretion responsibly, while allowing the agency to take on challenging issues and

litigate complex cases, including cases of systemic discrimination. This measure is significant

because the achievement of success in cases raising priority issues under the SEP is often challenging and resource-intensive, especially in cases involving emerging or developing issues and systemic cases. The EEOC seeks to reach and, when possible, exceed these ambitious targets through FY 2026.

**Performance Measure 3 for Strategic Objective I.A.:** In each year through FY 2026, the EEOC increases its capacity to conduct investigations of systemic discrimination through training and other resources.

**Sub-Measure 3a.:** In each year through FY 2026, the EEOC will provide training to all field staff on identifying and investigating systemic discrimination, and at least 90% of investigators and trial attorneys will participate in systemic training each year.

**Sub-Measure 3b.:** By FY 2026, 90% of systemic cause investigations reviewed meet or exceed criteria established in the Quality Enforcement Practices Plan.

| FY 2022 | 88%. |
| --- | --- |
| FY 2023 | Increase target to 88.5%. |
| FY 2024 | Increase target to 89%. |
| FY 2025 | Increase target to 89.5%. |
| FY 2026 | Increase target to 90%. |

**Sub-Measure 3c.:** By 2026, every District will have at least two dedicated Enforcement Unit systemic staff members.

Performance Measure 3 emphasizes expanding the EEOC's capacity to conduct systemic investigations, resulting in a coordinated, strategic, and effective approach to systemic enforcement. Refocusing efforts on cases that have a broad impact on an industry, profession, company, or geographic region will allow the EEOC to increase its impact on dismantling discriminatory patterns, practices, or policies. The Commission is committed to tackling systemic employment discrimination in all forms and on all bases. Eliminating systemic barriers to equal opportunity in the workplace will allow the EEOC to leverage its work to achieve the greatest impact. Providing training to EEOC staff on identification and investigation of systemic cases is critical to the success of these efforts.

The EEOC has numerous tools to combat systemic discrimination and harassment, including outreach and education, technical assistance, and enforcement, and will use all of them to achieve change on a broad scale. A robust systemic program is an important part of these efforts and will allow the EEOC to advance equal employment opportunity on a national, regional or industry level while helping substantial numbers of employees at the same time.

**Performance Measure 4 for Strategic Objective I.A.:** By FY 2026, the EEOC will make significant

progress toward enhanced monitoring of conciliation agreements, leading to a more robust compliance program.

**Sub-Measure 4a.:** Each year, the EEOC will report on enhancements to its compliance monitoring program for conciliation agreements.

| FY 2022 | Report issued. |
|---------|----------------|
| FY 2023 | Report issued. |
| FY 2024 | Report issued. |
| FY 2025 | Report issued. |
| FY 2026 | Report issued. |

Performance Measure 4 recognizes that compliance reviews are critical to ensuring full satisfaction of the EEOC's conciliation agreements. When the EEOC finds reasonable cause to believe discrimination has occurred, the agency issues a determination and invites the parties to engage in informal efforts to resolve the charge, known as conciliation. Successful conciliation agreements routinely include relief for the aggrieved individuals, as well as targeted, equitable relief that explicitly addresses the discriminatory employment practices at issue in the case and is designed to prevent similar violations in the future. Effective compliance monitoring is critical to the EEOC's ability to ensure workplaces are free from discrimination after the EEOC makes a finding of discrimination.

With an emphasis on progress, Performance Measure 4 will lead to enhanced compliance monitoring, including streamlined and standardized procedures, improved tracking and internal reporting mechanisms, and related training for EEOC field staff. Collaboration, evaluation, and system improvements are critical to this performance measure, and reporting on enhancements will ensure meaningful progress.

**Performance Measure 5 for Strategic Objective I.A.:** By FY 2026, 74% of federal agencies subject to oversight activities or compliance reviews change their employment practices based on EEOC recommendations.

| FY 2022 | 70% |
|---------|-----|
| FY 2023 | Increase target to 71%. |
| FY 2024 | Increase target to 72%. |
| FY 2025 | Increase target to 73%. |
| FY 2026 | Increase target to 74%. |

Performance Measure 5 recognizes that because the federal government is the largest employer in the United States, reducing unlawful employment discrimination in the federal sector is an integral part of combatting employment discrimination in the nation's workplaces. Moreover, as the largest employer in the United States, the federal government has tremendous influence over the employment practices of private and public employers across the nation and around the world. Thus, the promotion of equal employment opportunity in the federal government can positively impact all employees and jobseekers.

Each year, the EEOC conducts program evaluations of a sample of federal agencies, focused on an array of issues relevant to the agency. The evaluations are summarized, with EEOC recommending changes in the agency's employment practices, if needed. These recommendations include steps federal agencies can take to correct any discriminatory practice identified by the evaluation. Agencies provide the EEOC with their Compliance Plans in response to the reports. For the baseline year of FY 2022, the EEOC reviewed the Compliance Plans issued in FY 2020 and determined whether they were implemented successfully and, if not, what corrective action was appropriate. Based on the EEOC's assessment of compliance, a baseline for the number or percent of agencies successfully changing practices was established for subsequent years.

**Performance Measure 6 for Strategic Objective I.B.:** For each year throughFY 2026, a significant proportion of completed investigations, conciliations, hearings, and federal appeals meet or exceed established quality criteria.

**Sub-Measure 6a.**: By FY 2026, at least 90% of the EEOC's charge investigations and conciliations meet or exceed criteria established in the Quality Enforcement Practices Plan.

| FY 2022 | 88%. |
|---------|------|
| FY 2023 | Increase target to 88.5%. |
| FY 2024 | Increase target to 89%. |
| FY 2025 | Increase target to 89.5%. |
| FY 2026 | Increase target to 90%. |

**Sub-Measure 6b.**: Each year through FY 2026, at least 90% of the EEOC's federal sector hearings and appeals meet criteria established in the Federal Sector Quality Practices Plan.

Performance Measure 6 builds on the EEOC's previous Strategic Plan with a metric focused on quality in both the private and federal sector programs. In September 2015, the Commission approved a plan for Quality Enforcement Practices for Effective Investigations and Conciliations, known as the QEP. The QEP promotes the rigorous implementation of quality investigations and conciliations with progress goals established for each year of the Plan. In FY 2016, the EEOC applied the criteria established under the QEP to a sample of investigations and conciliations to

establish benchmarks for offices to use in fiscal year 2017. In FY 2018, the EEOC used those

benchmarks to begin projecting future targets. The EEOC continues to use the FY 2018 baseline for its target projections through FY 2026. The increased goals for quality reviews in this plan will strengthen opportunities to constructively resolve cases for workers and employers through investigation and conciliation.

Performance Measure 6 also provides targets for quality work in the federal sector. The Federal Sector Quality Practices Plan (FSQP) was approved by the Commission on January 10, 2017 and includes quality components for hearings and appeals. The FSQP also includes quality criteria for the Commission's oversight of federal agencies when reviewing affirmative employment and barrier analysis plans, evaluating federal agency complaint processes, and offering technical assistance to federal agencies. During FY 2018, the agency collected baseline data on the quality criteria set forth in the FSQP, in a manner similar to what was done to implement the QEP. Following the collection of baseline data based on hearings and appeals file reviews and federal agency compliance reviews, the agency established benchmarks for FY 2019 and subsequent years, continuing through FY 2026.

**Performance Measure 7 for Strategic Objective I.B.:** By FY 2026, EEOC will enhance its intake services to potential Charging Parties, Respondents, and Representatives.

**Sub-Measure 7a.:** By FY 2023, the EEOC will evaluate its intake services, determine baseline levels of service, and identify technological solutions and other resources to improve and expand accessibility to those services.

**Sub-Measure 7b.:** From FY 2024-2026, the EEOC will make yearly progress in improving availability of intake interview appointments.

Performance Measure 7 recognizes the importance of intake to the EEOC charge filing process. Intake is the first step in the investigative process. On November 1, 2017, the EEOC's digital charge system was launched nationwide, and the EEOC Public Portal became available to individuals to file inquiries online and schedule an intake appointment with an EEOC representative. The EEOC's online intake and appointment system standardized and modernized the intake process, resulting in improved efficiencies and access for the public. Sub-Measures 7a. and 7b. also are in line with the Government Accountability Office's October 2022 report on the EEOC's enforcement and outreach efforts, which recommended that the agency track intake timeframes to help assess service to the public.

In FY 2022, the EEOC received more than 218,000 inquiries in field offices, including over 160,900 through the online intake and appointment system, which resulted in the filing of 73,485 charges of discrimination. In addition, the EEOC's Intake Information Group (IIG) received over 475,000 phone calls and more than 68,700 emails in FY 2022. The EEOC is committed to improving intake services to the public as new challenges emerge, including a continued high demand for intake information and appointments. The EEOC will continue to re-evaluate intake processes to

innovate, increase intake appointment availability and accessibility, and improve overall service to the public.

Case 2:24-cv-12817-BRM-CI   ECF No. 32, PageID.266   Filed 03/10/25   Page 37 of 105

# Strategic Goal II

**PREVENT EMPLOYMENT DISCRIMINATION AND ADVANCE EQUAL EMPLOYMENT OPPORTUNITIES THROUGH EDUCATION AND OUTREACH**

Investigations, mediations, conciliations, and litigation are only some of the means that the EEOC uses to fulfill its mission and vision. Title VII expressly requires the agency to engage in education and outreach activities, including providing training and technical assistance, on the laws enforced by the EEOC. Strategic Objective II, to prevent employment discrimination and advance equal employment opportunities through education and outreach, reflects the EEOC's obligation to deter employment discrimination before it occurs. Educational and outreach programs, projects, and events are also cost-effective law enforcement tools because they promote understanding of the law and voluntary compliance. All parties benefit when the workplace is free of discrimination, and everyone has access to equal employment opportunity.

There are two objectives for Strategic Goal II:

**Strategic Objective II.A.:** Members of the public are aware of employment discrimination laws and know their rights and responsibilities under these laws; and

**Strategic Objective II.B.:** Employers, federal agencies, unions, and staffing agencies have the information and guidance necessary to advance equal employment opportunity, prevent discrimination, and effectively resolve EEO issues.

The EEOC aims its education and outreach program primarily toward individuals who historically have been subjected to employment discrimination. The Commission also provides outreach and education to particularly vulnerable communities that may be unfamiliar with EEO laws, or unwilling or unable to exercise their rights under these laws, such as individuals who are new to the workforce, immigrants, or migrant workers. Moreover, it is important for the agency to provide technical assistance to underserved segments of the employer community, including small, new and disadvantaged businesses. Given their size and limited resources, such businesses are often less able to take advantage of the EEOC's training programs and are less likely to have in-house human resources professionals to assist them with compliance. In FY 2017, the agency's Small Business Task Force launched a comprehensive website and published numerous resource documents for small employers. It is clear, however, that additional efforts are needed to reach small and new businesses.

The EEOC has a robust education and outreach program that provides both free and fee-based opportunities for stakeholders and the public. In FY 2022, the EEOC provided free training on

rights and responsibilities under its statutes to more 218,000 individuals at more than 3,000 events. In the same year, the EEOC provided fee-based training to nearly 12,000 individuals at more than 280 events.

The EEOC often cooperates with other agencies in the performance of educational and outreach activities. The EEOC's 91 State and local FEPAs and the approximately 62 TEROs, discussed above, are important partners in this regard, as are the Department of Labor's Office of Federal Contract Compliance Programs and the Department of Justice's Civil Rights Division.

The EEOC's efforts to strengthen and focus its education and outreach activities have included increasing its use of technology and expanding the EEOC's social media presence. The EEOC's website provides critical educational materials, including information on the laws the agency enforces, the private sector charge and federal sector complaint processes, data, and research. The agency has continued to make progress toward making its website more user-friendly and accessible. This Plan emphasizes the need to leverage technology to directly reach the agency's varied and wide-ranging audiences—including employees, jobseekers, employers, unions, employment agencies, attorneys, judges, issue advocates, and policymakers. In addition, the EEOC will continue to enhance its use of social media to promote its education and outreach activities and to encourage greater use of the website.

With a continued focus on providing clear, easy-to-understand materials for a diverse array of audiences, this Plan also provides that the EEOC will review its sub-regulatory documents and update or augment them as appropriate with accessible and plain language materials.

Finally, continued emphasis on outreach and education in the federal sector is equally important to the EEOC's efforts to promote broad compliance with federal workplace anti-discrimination laws. In FY 2022, the EEOC built upon its robust education and outreach program that focuses on both free and fee-based education and training opportunities in the federal sector and leveraged the use of technology to strengthen and expand the impact of its education and outreach activities. In total, the EEOC delivered nearly 200 federal sector outreach, education, and training events, and provided more than 18,000 federal sector employees and EEO professionals with information about employment discrimination and their rights and responsibilities in the workplace. This Plan leverages these activities and relationships to drive the creation of a government-wide network to provide information about leading practices in the Federal Sector.

The agency will employ ten strategies for achieving the goals of Strategic Goal II, including four correlated strategies designed to support both strategic objectives under this goal:

The EEOC's strategies for achieving Strategic Objective II.A. are:

*Strategy II.A.1*: Leverage technology and use innovative strategies to expand EEOC's reach to diverse populations.

*Strategy II.A.2*: Target outreach to vulnerable workers and underserved communities.

The strategies for achieving Strategic Objective II.B. are:

*Strategy II.B.1*: Leverage technology and media to expand EEOC's reach to employers and other covered entities and to ensure broad awareness of EEOC's litigation and other enforcement efforts, to the extent they may be made public.

*Strategy II.B.2*: Promote promising practices that employers can adopt to prevent discrimination in the workplace.

*Strategy II.B.3*: Target outreach to small, new, and disadvantaged/underserved employers.

*Strategy II.B.4*: Foster partnerships linking federal agencies to shared EEO resources and services.

Correlated strategies under Strategic Goal II include:

*Strategy II.A.3/II.B.5*: Provide up-to-date, accessible guidance and training on the requirements of employment discrimination laws.

*Strategy II.A.4/II.B.6*: Increase the knowledge of targeted audiences through focused, innovative collaborations with internal and external stakeholders.

*Strategy II.A.5/II.B.7*: Provide the infrastructure needed to support the development and delivery of online outreach and education.

*Strategy II.A.6/II.B.8*: Ensure support services that promote the accessible delivery of outreach and education.

The EEOC developed four performance measures to track its progress in achieving its objectives for Strategic Goal II.

**Performance Measure 8 for Strategic Objectives II.A. and II.B.:** By FY 2026, the EEOC leverages technology, analytics, and innovative outreach strategies to provide members of the public greater access to information about their rights and responsibilities.

| FY 2022 | The agency will implement and report on at least four projects in which it has leveraged technology, analytics, and innovative outreach strategies to increase access to information to vulnerable communities consistent with the Strategic Enforcement Plan (SEP). |
|---------|---|
| FY 2023 | The agency will implement and report on at least four projects in which it has leveraged technology, analytics and innovative outreach strategies to increase access to information to vulnerable communities consistent with the SEP. |
| FY 2024 | The agency will implement and report on at least four projects in which it has leveraged technology, analytics and innovative outreach strategies to increase access to |

| | information to vulnerable communities consistent with the SEP, as well as how the findings from FY 2023 have been utilized to increase access to information. |
|---|---|
| FY 2025 | The agency will implement and report on at least four projects in which it has leveraged technology, analytics and innovative outreach strategies to increase access to information to vulnerable communities consistent with the SEP, as well as how the findings from FY 2024 have been utilized to increase access to information. |
| FY 2026 | The agency will implement and report on at least four projects in which it has leveraged technology, analytics and innovative outreach strategies to increase access to information to vulnerable communities consistent with the SEP, as well as how the findings from FY 2025 have been utilized to increase access to information. |

Performance Measure 8 focuses on using technology, analytics and innovative outreach strategies to strengthen and expand the impact of the EEOC's education and outreach activities in reaching vulnerable communities consistent with the EEOC's SEP. This will be accomplished by utilizing analytics and metrics to directly measure the impact of each effort to reach communities. If the effort is successful, it should be incorporated into the EEOC's efforts moving forward. If the effort does not reach the intended audience–balancing the level of effort with results–then the technology or strategy should be modified. By using this process, the EEOC can continue to grow and expand its ability to reach vulnerable communities with information critical to expanding equal employment opportunity.

**Performance Measure 9 for Strategic Objectives II.A. and II.B.:** By FY 2026, participants in outreach, training, and technical assistance programs indicate either an improvement in an employment policy, practice, or procedure (employer representatives), or an increased knowledge of the laws the EEOC enforces (individuals) as a result of their participation.

| FY 2022 | Begin development of mechanism for reporting on agency-wide outreach events and feedback. |
|---|---|
| FY 2023 | Develop mechanism for gathering participant feedback. |
| FY 2024 | Pilot the gathering of participant feedback, make necessary adjustments, and set baseline metrics for the measure. |
| FY 2025 | Report on information gathered and how this information has been used to facilitate positive changes to outreach programs. |
| FY 2026 | Report on information gathered and how this information has been used to facilitate positive changes to outreach programs. |

Under the prior Strategic Plan, the Commission's outreach and education efforts were in part measured by the number of sustained partnerships established and maintained with

organizations that represented (1) vulnerable or underserved communities and (2) small and new businesses. This Plan is focusing on the qualitative impact of the outreach provided to the EEOC's partners and the public. While not all participants will make a change to a policy or increase their knowledge of the laws the EEOC enforces, this measure can provide the agency with information about common gaps in knowledge as well as effective ways to communicate with audiences. By using this information in planning and implementing outreach efforts, the agency can have a positive impact on preventing discrimination and advancing equal employment opportunity.

**Performance Measure 10 for Strategic Objectives II.A. and II.B.:** By FY 2026, the EEOC updates existing guidance and training materials, and creates new, user-friendly resource tools to address and prevent workplace discrimination.

| FY 2022 | Begin development of priority lists of existing guidance and training materials for review and development. |
|---------|---|
| FY 2023 | Create cross functional group and begin review and update of at least two resources or guidance documents on priority list. |
| FY 2024 | Create or review and update at least two resource or guidance documents on priority list. |
| FY 2025 | Create or review and update at least two resource or guidance documents on priority list. |
| FY 2026 | Create or review and update at least two resource or guidance documents on priority list. |

Performance Measure 10 will ensure that the EEOC's sub-regulatory guidance documents and resource materials are updated to use plain language. The target for FY 2022 is to establish a cross-functional group representing offices that develop and utilize outreach and public materials to assess the status of current resources, identify necessary updates, and establish a schedule that prioritizes those most critical for action. The agency's enforcement work in the private and public sectors, its adjudicatory and oversight work in the federal sector, and its outreach and education work all depend on the availability of up-to-date and accessible materials explaining the laws the EEOC enforces and how to comply with them. While the regulations issued by the Commission set the basic legal framework for the implementation of those laws, sub-regulatory materials, including the EEOC's Compliance Manual, provide more tangible assistance to those with rights and responsibilities under such laws. These materials may require a vote of the Commission and may include a range of guidance material, best practices, Q&A's, website resources, outreach materials, and fact sheets.

**Performance Measure 11 for Strategic Objective II.A.:** Develop a federal government-wide network and repository to share EEO resources and leading practices that are occurring across the federal government.

| FY 2022 | Develop framework for plan for network and repository. |
| FY 2023 | Complete plan for network and repository, including stakeholder input. |
| FY 2024 | Implement the network and repository.  Develop baselines and goals for FY 2025 and FY 2026 to measure the number of users and impact of system. |
| FY 2025 | Report on the goals and any adjustments made to increase users and impact. |
| FY 2026 | Report on the goals and any adjustments made to increase users and impact. |

Performance Measure 11 builds on the leadership and guidance the EEOC provides to federal agencies on all aspects of their EEO programs. As part of this role, the EEOC ensures federal agency compliance with federal sector regulations; provides technical assistance to federal agencies concerning EEO complaint adjudication; monitors and evaluates federal agencies' affirmative employment programs; produces an annual report on federal sector complaint processing, appellate case processing, and compliance; produces reports on significant issues and government-wide trends in the federal sector; develops and distributes federal sector educational material; and conducts training for stakeholders. The EEOC embraces and recognizes the value of proactive prevention. Thus, in addition to taking remedial actions when agencies fail to comply with the EEOC's appellate orders, regulations, or directives, the EEOC continues and enhances its practice of providing technical assistance to agencies on a routine basis, before problems arise.

This Plan leverages EEOC's existing work and partnerships to develop a government-wide network and repository for EEO resources and leading practices. The goal of the new network and repository is to facilitate better communication across agencies and create a space for the sharing of practices that will positively impact equal employment opportunity in the federal workplace.

# Strategic Goal III

### STRIVE FOR ORGANIZATIONAL EXCELLENCE THROUGH OUR PEOPLE, PRACTICES AND TECHNOLOGY

Strategic Goal III, achieving organizational excellence, seeks to improve management functions with a focus on people, service to the public, information technology, infrastructure enhancement, and accountable financial stewardship. These areas are cross-cutting and require integration and coordination to promote organizational excellence from internal and external perspectives.

For the EEOC to accomplish Strategic Goals I and II, it must ensure excellence in its people and the service it provides to the public, as well as its effective management of financial and technological resources. Strategic Goal III is both stewardship-focused and operational. In recognition of this, and to ensure the agency is held accountable for improving its operations where necessary, the Commission is including Organizational Excellence as a goal in its Strategic Plan.

There are two objectives for Strategic Goal III:

**Strategic Objective III.A.**: The EEOC achieves a culture of accountability, inclusivity, and accessibility.

**Strategic Objective III.B.**: Resources align with priorities to strengthen intake, outreach, education, enforcement, and service to the public to protect and advance civil rights in the workplace.

The EEOC's strategies for achieving Strategic Objective III.A. are:

*Strategy III.A.1*: Recruit, develop, and retain talented employees.

*Strategy III.A.2*: Advance performance management to maximize organizational improvement.

*Strategy III.A.3*: Enhance diversity, equity, inclusion, and accessibility in the workplace.

*Strategy III.A.4*: Develop and support innovation and collaboration to advance employee engagement and morale.

*Strategy III.A.5*: Promote a culture of continuous improvement.

*Strategy III.A.6*: Foster constructive employee and labor management relations.

*Strategy III.A.7*: Strive to be a model employer and to promote equal employment opportunity.

*Strategy III.A.8*: Develop and implement a robust leadership and succession plan.

The strategies for achieving Strategic Objective III.B. are:

*Strategy III.B.1*: Expand the use of technology to better serve the public and improve productivity.

*Strategy III.B.2*: Leverage the use of data, analytics, and information management to support, evaluate, and improve the agency's programs and processes.

*Strategy III.B.3*: Prioritize and actively manage available fiscal resources to best achieve the agency's mission.

**Performance Measure 12 for Strategic Objective III.A.:** Effectively allocate people and
resources to accomplish agency mission goals, within budgetary limitations.

The EEOC developed four performance measures to track its progress in achieving its objectives
for Strategic Goal III.

| FY | |
|---|---|
| **FY 2022** | Staff the agency at its authorized Full Time Equivalent (FTE) levels and increase the total number of employees to effectively enforce EEOC laws and achieve the Agency's mission.  Enhance efforts to recruit, hire, train, develop and retain a broadly diverse workforce, including veterans, members of underrepresented groups, and individuals with disabilities, that is as effective as possible in serving America's racially, ethnically, and culturally diverse population of workers . |
| **FY 2023** | Maintain the EEOC's authorized FTE levels through hiring and retention and the use of nontraditional talent pools and ensure the hiring process is accessible to underrepresented groups. Promote the EEOC as a model of diversity, equity, inclusion, workplace flexibility, accessibility, and excellence. |
| **FY 2024** | Increase the EEOC's workforce based on authorized budget levels. Expand the use of hiring reform programs and appointments (e.g., Pathways Programs, Law Clerk, Schedule A and other hiring authorities) to recruit, develop, and retain  skilled workers for the agency. |
| **FY 2025** | Maintain the EEOC's authorized FTE levels. Use skills gap analysis to guide future training and development efforts to close any identified gaps and ensure the EEOC's mission-critical occupations (i.e., EEO Investigator, Trial Attorney, General Attorney, Attorney Examiner/AJ, Mediator, and EEO Specialist) have the core competencies to perform successfully and achieve the EEOC's mission. |
| **FY 2026** | Maintain the EEOC's authorized FTE levels.  Provide a variety of professional development opportunities for all employees at all grade levels. |

Performance Measure 12 focuses on recruiting, developing, and retaining a diverse and talented
workforce with a goal of reaching and maintaining authorized FTE levels by 2026 (subject to
budget availability) with an emphasis on front-line staff. This performance measure takes a
holistic approach, using various workforce strategies to return to (and maintain) staffing levels
comparable to a decade ago, recognizing that the ability to add staff is contingent on final fiscal
year spending bills.

Additionally, the EEOC recognizes the importance of continued diversity efforts and execution of
Executive Order 14035 – *Diversity, Equity, Inclusion, and Accessibility (DEIA) in the Federal
Workforce*. Performance Measure 12's allocation of resources and workforce planning efforts will
also focus on deploying a variety of DEIA initiatives and continually monitoring the EEOC's

progress toward its principal organizational goal of becoming a model employer that promotes
equal employment opportunity.

**Performance Measure 13 for Strategic Objectives III.A. and III.B.:** Feedback surveys and other
mechanisms provide measures of satisfaction for EEOC stakeholder experiences.

| | |
|---|---|
| **FY 2022** | Improve eeoc.gov feedback surveys, adjusting the measures and targets, as necessary. Utilize additional feedback surveys and other mechanisms to obtain data regarding process changes that were adopted in response to the pandemic. |
| **FY 2023** | Expand feedback surveys and other mechanisms to obtain data and to provide measures of satisfaction for additional services, such as the charge filing experience and digital services. Review the results at the end of the fiscal year to set targets for next year. |
| **FY 2024** | With new services baselines developed in FY 2023, set goals for improvement at the beginning of the fiscal year and review results at the end. |
| **FY 2025** | Set goals for improvement at the beginning of the fiscal year, review/revise existing goals as necessary, and expand customer satisfaction surveys/baselines to encompass additional services. |
| **FY 2026** | With the baselines developed in FY 2025, set goals for improvement at the beginning of the fiscal year and review results at the end. |

Performance Measure 13 focuses on obtaining feedback on services provided to the EEOC's
stakeholders. It supports Strategic Objective III.B., to align resources with agency priorities by
strengthening intake, outreach, education, enforcement, and service to the public, by obtaining
and evaluating feedback from the targeted audiences the Commission serves. This feedback then
provides measurement of the agency's delivery of services and allows improvements to be
targeted to areas identified by stakeholders. The EEOC recognizes the importance of examining
the effectiveness of the Commission's work, particularly the efficacy of intake, outreach,
education, guidance, and technical assistance documents, to constantly improve the agency's
ability to serve the public and prevent and remedy discrimination.

**Performance Measure 14 for Strategic Objective III.B.:** Build and deploy charge/case
management systems for Litigation and Federal Sector program offices. Complete deployment,
monitor and improve effectiveness of digital charge/case management system for program
offices.

| | |
|---|---|
| **FY 2022** | Complete the deployment of the agency's modernized charge/case management system (ARC) for the private sector and state and local programs. |

| | |
|---|---|
| **FY 2023** | Complete the deployment of the agency's modernized charge/case management system (ARC). |
| | Develop baselines and measure the effectiveness of the modernized charge/case management system. |
| **FY 2024** | Based on the stakeholder feedback gathered in *Performance Measure 13 for Strategic Objective III.A.,* link the modernized charge/case management system (ARC) to new and redesigned digital services for the agency's multiple external constituencies, including for charging party attorney representatives. |
| **FY 2025** | To improve the effectiveness of the program, develop a plan of actions and milestones for the agency's modernized charge/case management system (ARC). Report on progress annually and adjust the plans, as necessary. |
| **FY 2026** | To improve the effectiveness of the program, develop a plan of actions and milestones for the agency's modernized charge/case management system (ARC). Report on progress annually and adjust the plans, as necessary. |

With the first portion of the Technology Modernization Fund (TMF) award, the agency developed modernized charge management services for EEOC private sector enforcement staff and its 92 State and Local Government FEPAs. On January 18, 2022, the new Agency Records Center (ARC) system went live for 145 EEOC and FEPA offices and more than 2,000 users. This deployment was the culmination of 22 months of work, during which the EEOC charge management modernization team defined and developed a charge management solution to enable private sector charge management processes.

The second, and final, portion of TMF funding was received in mid-2022, supporting the remaining two domains that will be serviced by ARC. The present effort is the development and deployment of services to support the agency's Litigation and Litigation Appeals processes. As this effort heads into its testing phases, the agency will begin work on the development and deployment of services to support the agency's Federal Sector Hearing and Appeals processes.

As the EEOC completes the modernization of its charge/case management systems, the agency will seek to maximize its investment in ARC and to provide improved constituent services by re-platforming and modernizing its ARC-linked public-facing portals. Performance Measure 14 seeks to track and assess progress on completing the modernization of and fully utilizing the agency's charge/case management system and related constituent services.

**Performance Measure 15 for Strategic Objective III.B.:** The budget process prioritizes funding for the EEOC's strategic goals.

| FY 2022 | As part of an overall increase in budget development transparency, produce an annual congressional budget justification and operating plan that reflects strategic enforcement, outreach and education, and management priorities. Meet all submission deadlines. |
|---|---|
| FY 2023 | As part of an overall increase in budget development transparency, produce an annual congressional budget justification and operating plan that reflects strategic enforcement, outreach and education, and management priorities. Meet all submission deadlines. |
| FY 2024 | As part of an overall increase in budget development transparency, produce an annual congressional budget justification and operating plan that reflects strategic enforcement, outreach and education, and management priorities. Meet all submission deadlines. |
| FY 2025 | As part of an overall increase in budget development transparency, produce an annual congressional budget justification and operating plan that reflects strategic enforcement, outreach and education, and management priorities. Meet all submission deadlines. |
| FY 2026 | As part of an overall increase in budget development transparency, produce an annual congressional budget justification and operating plan that reflects strategic enforcement, outreach and education, and management priorities. Meet all submission deadlines. |

By developing a strong and clear message for use in budget documents and other publications, the EEOC demonstrates the nexus between its budget requests, allocations and operating plans and the achievement of its mission and vision. A universal understanding of how the strategic goals and objectives direct the work of the agency is necessary for success. The EEOC will achieve this common understanding in various ways, including integrating Strategic Plan objectives with performance standards and ensuring that budget submissions from each component office explain how the agency's resources implement the goals and objectives of the Strategic Plan.

# External Factors Affecting the Achievement of the Strategic Plan

Many factors outside the EEOC's control will affect its ability to achieve the objectives set forth in the Strategic Plan. These factors include upcoming budgetary appropriations, demographic changes in the country, court decisions, passage of new laws, and technological advances. The Commission contemplated the following external factors in drafting this plan.

- **Budgetary Factors.** The Strategic Plan assumes no significant funding fluctuations. Therefore, while budgetary decreases would not change the overall structure of the plan, they would impact how quickly or completely the agency could achieve some of the plan's objectives. Regardless of budgetary changes, the Commission will continue to review available resources and priorities to ensure the appropriate allocation of funds across program areas.

- **Demographic Factors.** Demographic changes in the country, including migration patterns, educational levels of the population, the aging of the population, and the size of the population, as well as economic factors will necessarily impact the EEOC's work. For example, large-scale industry layoffs or other changes such as the COVID-19 pandemic or other public health threats may trigger a significant influx of charges, straining staff capacity to timely process or resolve them. Population shifts may result in increased charge receipts at some field offices, but budget constraints may not allow for hiring additional staff or shifting workloads among offices. Moreover, as populations shift, the agency may need to reassess the size and location of its offices.

- **Legal Factors.** All federal agencies are impacted by legal changes, but this is particularly true of law enforcement agencies. Interpretation of the laws the EEOC enforces by the U.S. Supreme Court may require the agency to issue updated guidance and regulations. Moreover, these rulings may impact the substantive priorities adopted by the Commission and/or may result in additional charges being filed with the agency. Also, if new laws related to the EEOC's jurisdiction are passed, the implementation of those laws will necessarily affect the substantive priorities of the agency.

- **Technological Factors.** Changes in technology use and requirements will impact how the EEOC interacts with the public. Increased requirements to combat cybersecurity threats and the need to communicate with a public that increasingly uses mobile and mobile-responsive technology will impact plans for technology infrastructure development.

Given the above factors, the EEOC will continually assess and prioritize its resources to successfully accomplish its mission over the next four years.


# Program Evaluations

Program evaluation is an important component of the EEOC's effort to assure that its programs are operating as intended and achieving results. A program evaluation is a thorough examination of program design or operational effectiveness that uses rigorous methodologies and statistical and analytical tools. Evaluations also use expertise internal and external to the agency and the program under review to enhance the analytical perspectives and lend credence to the methodologies employed, the evaluation processes and findings, and any subsequent recommendations.

Independent program evaluations have played an important role in formulating the strategic objectives and performance goals for the new FY 2022-2026 Strategic Plan. They have helped to shape some of the program issues and key focus areas for improvement, thereby increasing the plan's value as a management tool to guide the agency's strategic efforts in attaining overall productivity and program efficiency, effectiveness, and accountability. To that end, the EEOC has undertaken the following program evaluations to advance its performance-based management initiatives under the *Government Performance and Results Management Act*, and to improve the effectiveness of key agency programs. The findings and recommendations in these independent assessments of the agency's programs were used to guide development of its new strategic direction and goals for the next four to five years.

***Evaluation of the EEOC's Social Media Program* (https://oig.eeoc.gov/node/593)**, Hager Sharp, Office of Inspector General, July 2021.

***Evaluation of EEOC's Contracts Administration Activities* (https://oig.eeoc.gov/reports/audit/2019-001-eoig)**, Office of Inspector General, March 2020.

***EEOC Federal Hearings and Appeals Processes* (https://oig.eeoc.gov/reports/audit/2018-001-eoig)**, The Center for Organizational Excellence, Inc. and CohnReznick LLP, Office of Inspector General, March 2020.

***Evaluation of the EEOC's Data Analytics Activities* (https://oig.eeoc.gov/reports/audit/2017-002-eoig)**, Elder Research, Office of Inspector General, September 2018.

*Evaluation of EEOC's Strategic Enforcement Plan FY 2013–2016*, U.S. Equal Employment Opportunity Commission (EEOC) Office of Research, Information and Planning, July 2016.

***An Exploratory Evaluation of EEOC's Litigation Activities* (https://oig.eeoc.gov/reports/audit/2015-001-lit)**, The Urban Institute for the U.S. Equal Employment Opportunity Commission (EEOC) Office of Inspector General, June 2016.

***Evaluation of EEOC's Outreach and Education* (https://oig.eeoc.gov/reports/audit/2014-003-oe)**, The Urban Institute for the U.S. Equal Employment Opportunity Commission (EEOC) Office of Inspector General, May 2015.

***Urban Institute Evaluation of EEOC's Performance* Measures (https://oig.eeoc.gov/reports/audit/2012-010-pmev)**, The Urban Institute for the U.S. Equal Employment Opportunity Commission (EEOC) Office of Inspector General, March 2013.

Consistent with the Commission's focus on improving the effectiveness of government through rigorous evaluation and evidence-based policy initiatives, the EEOC will continue to identify appropriate program areas for evaluation during the reporting period of the agency's Strategic Plan for Fiscal Years 2022-2026. This will ensure that its efforts align with the agency's budget and

other programmatic priorities. The EEOC will assess its progress on an ongoing basis to reaffirm
its commitment to fulfilling the agency's mission.

# Acknowledgements

The process used to develop this update of the EEOC's Strategic Plan was a truly collaborative effort, involving a broad cross-section of EEOC employees and incorporating comments from our stakeholders and the public. The Commission extends a very special appreciation to the leaders and members of the Strategic Plan 2022-2026 National Workgroup (Appendix A) and the support of key staff from the Office of Enterprise Data and Analytics (Jiashen You, Lindsay Simon, Debra Anthony, Dona Bland and Joshua Book) and would like to acknowledge their extraordinary achievement in completing this plan. We thank them for their thorough engagement with this project and dedication to the agency's mission and vision.

# Appendix A – Strategic Plan National Workgroup

## Leadership

Chair - Cynthia G. Pierre, Ph.D., Chief Operating Officer and Chief Performance Improvement Officer

Co-Chair - Elizabeth Fox-Solomon, Chief of Staff, Office of the Chair

## Members

Bradley Anderson, District Director, Birmingham District Office

Julianne Bowman, District Director, Chicago District Office

Bryan Burnett, Chief Information Officer

Brett Brenner, Acting Deputy Chief Operations Officer, Office of the Chair

Robert Canino, Regional Attorney, Dallas District Office

Sheila Clark, Deputy Director, Office of the Chief Human Capital Officer

Thomas Colclough, Director, Field Management Programs, Office of Field Programs

Antoinette Eates, Chief of Staff, Office of the Vice Chair

Kimberly Essary, Deputy Director, Office of Enterprise Data and Analytics

Teresa Gimbrere, Assistant Director for Intake, Communications and Enforcement, Office of Federal Operations

Carlton Hadden, Director, Office of Federal Operations

Colleen Hampton-Lyster, Director, Advice, Audits, and External Reports Division, Office of Communications and Legislative Affairs

Bradford Kelley, Chief Counsel, Office of Commissioner Sonderling

Elisa Krobot, Chief Financial Officer

Donnie Landon, Director, Central Facilities Division, Office of the Chief Financial Officer

Louis Marino, Investigator, Philadelphia District Office, Office of Field Programs-AFGE representative

Savannah Marion-Felton, Attorney Advisor, Office of Legal Counsel

Mandana Massjouni, Director, Enterprise Application and Innovation Division, Office of the Chief Information Officer

Suzanne Nyfeler, Attorney Advisor, Office of Field Programs

Stephanie Perkins, Mediator, Detroit Field Office, Office of Field Programs-AFGE representative

Stan Petrusiak, Acting Director, Office of Civil Rights, Diversity and Inclusion

Kevin Richardson, Chief Human Capital Officer

Andrew Rogers, Chief Counsel, Office of Commissioner Lucas

Lucila Rosas, Special Assistant/Attorney Advisor, Office of the Chair

Jerome Scanlon, Assistant General Counsel, Office of General Counsel

Lisa Schnall, Senior Attorney-Advisor, Office of Legal Counsel

Susan Snare, Special Assistant/Attorney Advisor, Office of Commissioner Dhillon

Patricia St. Clair, Assistant Director for Training and Outreach, Office of Federal Operations

Nicole Thompson, Statistician, Office of Enterprise Data and Analytics

Yofi Weinberg, Operations and Policy Specialist, Office of Field Programs

# Appendix B – Performance Measures

| **STRATEGIC GOAL I:** Combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities. | **STRATEGIC GOAL II:** Prevent employment discrimination and advance equal employment opportunity through education and outreach. | **STRATEGIC GOAL III:** Strive for organizational excellence through our people, practices, and technology. |
|---|---|---|
| **Performance Measure 1 for Strategic Objective I.A.:** By FY 2025, 90% of EEOC conciliations and litigation resolutions contain targeted, equitable relief and that level is maintained in FY 2026. | **Performance Measure 8 for Strategic Objectives II.A. and II.B.:** By FY 2026, the EEOC leverages technology, analytics, and innovative outreach strategies to provide members of the public greater access to information about their rights and responsibilities. | **Performance Measure 12 for Strategic Objective III.A.:** Effectively allocate people and resources to accomplish agency mission goals, within budgetary limitations. |
| **Performance Measure 2 for Strategic Objective I.A.:** In each year through FY 2026, the EEOC continues to favorably resolve at least 90% of enforcement lawsuits. | **Performance Measure 9 for Strategic Objective II.A.:** By FY 2026 private and federal participants in outreach training and technical assistance programs indicate either an improvement in an employment policy, practice, or procedure (employer representatives), or an increased knowledge of the laws the EEOC enforces (individuals) as a result of their participation. | **Performance Measure 13 for Strategic Objective III.A.:** Feedback surveys and other mechanisms provide baseline measures of satisfaction for EEOC stakeholder experiences. |
| **Performance Measure 3 for Strategic Objective I.A.:** In each year through FY 2026, the EEOC increases its capacity to conduct investigation of systemic discrimination through training and other resources.<br><br>**Sub-Measure 3a.:** In each year through FY 2026, the EEOC will provide training to all field staff on identifying | **Performance Measure 10 for Strategic Objective II.A.:** By FY 2026, the EEOC updates existing guidance and training materials, | **Performance Measure 14 for Strategic Objective III.B.:** Build and deploy charge/case management system until completed in approximately 2023. Continue to monitor and improve effectiveness of digital charge/case management system for program offices. |

| **STRATEGIC GOAL I:** | **STRATEGIC GOAL II:** | **STRATEGIC GOAL III:** |
|---|---|---|
| Combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities. | Prevent employment discrimination and advance equal employment opportunity through education and outreach. | Strive for organizational excellence through our people, practices, and technology. |

| | | |
|---|---|---|
| and investigating systemic discrimination, and at least 90% of investigators and trial attorneys will participate in systemic training each year.<br><br>**Sub-Measure 3b.**: By FY 2026, 90% of systemic cause investigations meet or exceed criteria established in the Quality Enforcement Practices Plan.<br><br>**Sub-Measure 3c.**: By FY 2026, every District will have at least two dedicated Enforcement Unit systemic staff members.<br><br>**Performance Measure 4 for Strategic Objective I.A.:** By FY 2026, the EEOC will make significant progress toward enhanced compliance monitoring, leading to a robust compliance program for conciliation agreements.<br><br>**Sub-Measure 4a.:** Each year, the EEOC will report on enhancements to its compliance monitoring program. | and creates new, user-friendly resource tools to address and prevent workplace discrimination.<br><br>**Performance Measure 11 for Strategic Objective II.A.:** Develop a federal government-wide network and repository to share EEO resources and leading practices that are occurring across the federal government. | **Performance Measure 15 for Strategic Objective III.B.:** The budget process prioritizes funding for the EEOC's strategic goals. |

| **STRATEGIC GOAL I:** | **STRATEGIC GOAL II:** | **STRATEGIC GOAL III:** |
|---|---|---|
| Combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities. | Prevent employment discrimination and advance equal employment opportunity through education and outreach. | Strive for organizational excellence through our people, practices, and technology. |
| **Performance Measure 5 for Strategic Objective I.A.:** By FY 2026, 74% of federal agencies subject to oversight activities or compliance reviews change their employment practices based on EEOC recommendations. | | |

**Performance Measure 6 for Strategic Objective I.B.: For each year through** FY 2026, a significant proportion of investigations, conciliations, hearings, and federal appeals meet or exceed established quality criteria.

**Sub-Measure 6a.:** By FY 2026, at least 90% of the EEOC's charge investigations and conciliations meet or exceed criteria established in the Quality Enforcement Practices Plan.

**Sub-Measure 6b.:** Each year through FY 2026, at least 90% of the EEOC's federal sector hearings and appeals meet criteria established in the Federal Sector Quality Practices Plan.

| **STRATEGIC GOAL I:** Combat and prevent employment discrimination through the strategic application of the EEOC's law enforcement authorities. | **STRATEGIC GOAL II:** Prevent employment discrimination and advance equal employment opportunity through education and outreach. | **STRATEGIC GOAL III:** Strive for organizational excellence through our people, practices, and technology. |
| --- | --- | --- |
| **Performance Measure 7 for Strategic Objective I.B.:** By FY 2026, the EEOC will enhance its intake services to potential Charging Parties, Respondents, and Representatives. **Sub-Measure 7a.:** By FY 2023, the EEOC will evaluate its intake services, determine baseline levels of service, and identify technological solutions and other resources to improve those services. **Sub-Measure 7b.:** From FY 2024-26, the EEOC will make yearly progress in improving availability of intake interview appointments. | | |

---

[1] OMB Circular No. A-11, Section 230.5 (2022), requires federal agencies to establish performance goals, measures, and targets aligned to the agency's objectives in the strategic plan, among other requirements.

[2] The Performance Measures are discussed in the Strategic Goal sections and in **Appendix B**.

[3] U.S. Equal Employment Opportunity Commission, EEOC Enforcement and Litigation Statistics, All Statutes (Charges filed with EEOC), FY 1997-FY 2022, https://www.eeoc.gov/data/charge-statistics-charges-filed-eeoc-fy-1997-through-fy-2022

[4] U.S. Equal Employment Opportunity Commission, FY 2023 Congressional Budget Justification Report, **Fiscal Year 2023 Congressional Budget Justification | U.S. Equal Employment Opportunity Commission (eeoc.gov) (https://www.eeoc.gov/fiscal-year-2023-congressional-budget-justification#h_46926156412811649183248018)** .

[5] *See* **Systemic Enforcement at the EEOC | U.S. Equal Employment Opportunity Commission (https://www.eeoc.gov/systemic-enforcement-eeoc)**

[6] *See* **Advancing Opportunity A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission | U.S. Equal Employment Opportunity Commission (eeoc.gov) (https://www.eeoc.gov/advancing-opportunity-review-systemic-program-us-equal-employment-opportunity-commission)**

[7] Although the original term of the FY 2017-2021 SEP has expired, that SEP remains in effect until superseded, modified or withdrawn by vote of a majority of members of the Commission. *See* **https://www.eeoc.gov/us-equal-employment-opportunity-commission-strategic-enforcement-plan-fiscal-years-2017-2021 (https://www.eeoc.gov/us-equal-employment-opportunity-commission-strategic-enforcement-plan-fiscal-years-2017-2021)** .

# EXHIBIT B

# EEOC STRATEGIC ENFORCEMENT PLAN 2024–2028



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# Table of Contents

EXECUTIVE SUMMARY ....................................................................................................................2

I. GUIDING PRINCIPLES OF THE STRATEGIC ENFORCEMENT PLAN ..........................................5

    A. A Strategic Approach — focus on priorities to maximize the EEOC's impact......................5

    B. An Integrated Approach — collaboration, coordination, and consistency ..........................5

    C. Accountability and Delivery of Results — taking ownership to achieve results and serve the
    public given available resources..........................................................................................6

II. PRINCIPLE ONE: A STRATEGIC APPROACH TO STRENGTHEN ENFORCEMENT ......................7

    A. Focus on Strategic Impact to Leverage EEOC Resources Most Effectively...........................7

    B. Subject Matter Priorities for Fiscal Years 2024–2028 ........................................................7

    C. Subject Matter Priorities ...................................................................................................8

    D. District and Federal Sector-Specific Priorities................................................................. 12

    E. Implementing SEP priorities ........................................................................................... 12

    F. Other Priorities ............................................................................................................... 14

III. PRINCIPLE TWO: INTEGRATING EFFORTS ACROSS EEOC ................................................... 15

    A. Integrating Administrative Enforcement and Legal Enforcement in the Public and
    Private Sectors.................................................................................................................. 15

    B. Integrating Federal Sector Activities ............................................................................... 16

    C. Integrating Education and Outreach Activities................................................................ 16

    D. Integrating Research, Data, and Analytics ...................................................................... 17

    E. Collaborating with State and Local Fair Employment Practices Agencies and Tribal
    Employment Rights Offices .............................................................................................. 17

    F. Supporting Private Enforcement of the Federal Anti-Discrimination Laws........................ 18

    G. Collaborating with Other Federal Agencies.................................................................... 18

IV. PRINCIPLE THREE: DELIVERY OF RESULTS ........................................................................ 19

EFFECTIVE DATE....................................................................................................................... 19

ACKNOWLEDGMENTS .............................................................................................................. 19

# Executive Summary

The U.S. Equal Employment Opportunity Commission (EEOC) was created by the landmark Civil Rights Act of 1964 in direct response to calls for racial and economic justice at the historic March on Washington for Jobs and Freedom. As the primary federal agency charged by Congress with enforcing laws against employment discrimination, the EEOC's mission is to prevent and remedy unlawful employment discrimination and advance equal employment opportunity for all.[1]

The purpose of the EEOC's Strategic Enforcement Plan (SEP)[2] is to focus and coordinate the agency's work over a multiple fiscal year (FY) period to have a sustained impact in advancing equal employment opportunity. The agency's first Strategic Enforcement Plan adopted for FY 2013–2016 established subject matter priorities and strategies to integrate the EEOC's private, public, and federal sector activities. In adopting the FY 2017–2021 SEP, the Commission reaffirmed its subject matter priorities with some modifications and additions.

In developing the draft FY 2024–2028 SEP, the EEOC sought input from the public through a series of listening sessions and a dedicated email box. At the three public listening sessions, the EEOC heard from a total of 35 witnesses, including representatives from civil rights and workers' rights organizations, unions, employer and human resources representatives, scholars, and attorneys representing plaintiffs and defendants in employment discrimination matters.[3] The EEOC received additional public comments through the dedicated email box. The EEOC then published the draft SEP in the Federal Register for a 30-day public comment period and received a total of 48 comments.[4]

The EEOC is grateful to the public for its engagement and investment in the development of the SEP. The Commission carefully considered the thoughtful witness testimony and written submissions at the three listening sessions, the feedback provided through the dedicated email box, and

---

1   The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits discrimination based on race, color, religion, sex (including pregnancy, childbirth, or related medical conditions; sexual orientation; and gender identity), and national origin; the Equal Pay Act of 1963 (EPA), which prohibits discrimination in compensation based on sex; the Age Discrimination in Employment Act of 1967 (ADEA), which prohibits discrimination based on age for people age 40 and older; Section 501 of the Rehabilitation Act of 1973 and Titles I and V of the Americans with Disabilities Act of 1990 (ADA), which prohibit discrimination based on disability; Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA), which prohibits discrimination based on genetic information; and the Pregnant Workers Fairness Act (PWFA), which requires covered employers to provide reasonable accommodations to a qualified applicant's or employee's known limitations related to pregnancy, childbirth, or related medical conditions, unless the accommodation will cause the employer an undue hardship.

2   The SEP is a separate document from the agency's Strategic Plan. The Government Performance and Results Act (GPRA) Modernization Act of 2010 requires the EEOC to develop and post a Strategic Plan on its public website every four fiscal years. The Strategic Plan explains the agency's mission, operations, and processes for achieving general and long-term goals and objectives and approaches it will take to monitor its progress. In contrast, the SEP sets forth subject matter priorities to guide all aspects of EEOC's work to prevent and remedy unlawful employment discrimination.

3   See Appendix B for a full list of witnesses at the three public listening sessions.

4   Draft Strategic Enforcement Plan, U.S. Equal Employment Opportunity Commission, 88 FR 1379 (Jan. 10, 2023).

the comments submitted through regulations.gov. This unprecedented public input demonstrates the continued importance of EEOC's work and the vitality of the agency's mission. The suggestions received helped shape the final document and will inform the EEOC's implementation of the SEP over the next five years.

The final FY 2024–2028 SEP updates and refines the EEOC's subject matter priorities to reflect progress in achieving the EEOC's vision of fair and inclusive workplaces with equal opportunity for all, while also recognizing the significant challenges that remain in making that vision a reality. The brutal killings of George Floyd, Breonna Taylor, Adam Toledo, Tyre Nichols, and so many other people of color remain a painful reminder of systemic racism. The COVID-19 pandemic and its economic fallout disproportionately impacted people of color and other vulnerable workers, including those with disabilities, exposing and magnifying inequalities in our society. And high-profile incidents of bias and violence based on race, religion, national origin, and gender have impacted communities and workplaces across the country — including shootings targeting Black shoppers and workers in Buffalo, NY and Jacksonville, FL; Taiwanese churchgoers in Orange County, CA; patrons at an LGBTQI+ club in Colorado Springs, CO; and Jewish congregants in Pittsburgh, PA, among others. While these deep-rooted problems extend far beyond the workplace, the EEOC is committed to doing our part to combat systemic discrimination in employment. Addressing inequality in the workplace is a vital step in the broader fight for justice and equality. Every individual deserves the opportunity to make a living, support a family, and be respected in the workplace based on their skills and experience.

In implementing the SEP, the Commission can — and will — do more to combat employment discrimination, promote inclusive workplaces, and respond to the national call for racial and economic justice. Among other changes, this SEP:

- **Expands the vulnerable and underserved worker priority** to include additional categories of workers who may be unaware of their rights under equal employment opportunity laws, may be reluctant or unable to exercise their legally protected rights, or have historically been underserved by federal employment discrimination protections — such as people with intellectual and developmental disabilities; workers facing mental health related disabilities; individuals with arrest or conviction records; LGBTQI+ individuals; temporary workers; older workers; individuals employed in low-wage jobs, including teenage workers; and persons with limited literacy or English proficiency;

- **Refines the recruitment and hiring priority** to include addressing policies and practices that limit access to on-the-job training, pre-apprenticeship or apprenticeship programs, temp-to-hire positions, internships, or other job training or advancement opportunities based on protected status;

- **Recognizes employers' increasing use of technology** including artificial intelligence or machine learning, to target job advertisements, recruit applicants, and make or assist in hiring and other employment decisions, practices, or policies;

- **Updates the emerging and developing issues priority** to include protecting workers affected by pregnancy, childbirth, or related medical conditions, including under the Pregnant Workers Fairness Act; employment discrimination associated with the long-term effects of the COVID-19 pandemic, including Long COVID; and technology-related employment discrimination; and

- **Preserves access to the legal system** by focusing on overly broad waivers, releases, non-disclosure agreements, or non-disparagement agreements.

The SEP will help guide the EEOC's work through all of the agency's activities, including outreach, public education, technical assistance, enforcement, and litigation. Through its effective implementation, the agency will continue to advance in the nation's workplaces America's foundational goals of equality and justice for all.



# I. Guiding Principles of the Strategic Enforcement Plan

In developing the Fiscal Year 2024–2028 SEP, the Commission relied on three guiding principles, adapted from the principles underlying the prior two SEPs:

### A. A Strategic Approach — focus on priorities to maximize the EEOC's impact

The EEOC will take a strategic approach to enforcement. A strategic approach empowers Commission staff throughout the agency to direct attention and resources to the specific priorities identified in this SEP, with the goal of positively influencing employer practices and promoting legal compliance. Strategic enforcement will enhance the Commission's ability to prevent and eliminate unlawful employment practices, develop and clarify the law, and advance its mission and the public interest. A strategic approach includes proactive efforts to address SEP priority issues, including using Commissioner Charges and directed investigations as appropriate.

### B. An Integrated Approach — collaboration, coordination, and consistency

The EEOC will also ensure that its enforcement is integrated across the agency. An integrated approach means that the EEOC operates as one national law enforcement agency, while also appropriately reflecting local or regional priorities. This requires collaboration, coordination and communication between offices, staff, and program areas across the Commission, as well as consistent procedures in public-facing activities throughout the country. An integrated approach ensures that communications, outreach, education, training, research, and technology enhance and complement administrative and legal enforcement, policy development, and federal sector hearings, appeals, and oversight to advance the agency's mission. An integrated approach also recognizes that, where appropriate, enforcement in the private, public, and federal sectors should be coordinated and consistent.

Further, an integrated approach acknowledges that protecting workplace civil rights is a shared responsibility that extends beyond the EEOC. For example, the Department of Justice, Department of Labor, Fair Employment Practices Agencies (FEPAs), Tribal Employment Rights Offices (TEROs), and the private bar all play vital roles in preventing and remedying employment discrimination. As a result, it is important that the EEOC continue to collaborate with these entities, and coordinate across the federal government, to advance our shared missions and expand outreach to jobseekers, workers, and employers.

This SEP reaffirms that collaboration, coordination, and sharing of information within the EEOC and with our federal, state, local, and Tribal partners assist the Commission in operating strategically.

### C.  Accountability and Delivery of Results — taking ownership to achieve results and serve the public given available resources

As the primary federal agency entrusted by Congress with enforcing the nation's workplace discrimination laws, the EEOC is accountable to the public it serves to ensure its resources are used strategically and effectively to enforce the law and support those most in need of its assistance. Accountability means taking ownership to achieve results and to deliver timely, consistent, and high-quality service to the public given available resources.



## II. Principle One: A Strategic Approach to Strengthen Enforcement

### A. Focus on Strategic Impact to Leverage EEOC Resources Most Effectively

To maximize the EEOC's effectiveness as a national law enforcement agency, the Commission must focus on those activities that have the greatest strategic impact. The Commission defines strategic impact as a significant effect on the development of the law or on promoting compliance across a large organization, geographic region, or industry. Relevant factors in determining strategic impact include the significance of a particular issue, the potential outcome, the number of individuals or employers affected, and the opportunity to prevent or deter future violations and to have broad and lasting impact in advancing equal employment opportunity.

Systemic investigations, resolutions, and lawsuits typically have strategic impact because they involve "pattern or practice, policy and/or class cases where the discrimination has a broad impact on an industry, profession, company, or geographic location."[5] The Commission reaffirms its commitment to a nationwide, strategic, and coordinated systemic program as one of the EEOC's top priorities. The Commission also recognizes that an individual charge or case can have strategic impact, as defined above. Effective strategic enforcement includes a balance of individual and systemic cases, and of national and local issues, recognizing that each may have strategic impact in different and complementary ways.

The Commission's identification of subject matter priorities under this SEP recognizes that focused and collective work on these areas will also have strategic impact. In addition, the Commission will continue to pursue matters and issues that are not identified as SEP priorities where EEOC enforcement will have a strategic impact in advancing equal employment opportunity.

### B. Subject Matter Priorities for Fiscal Years 2024–2028

The Commission's goal in identifying agency-wide subject matter priorities is to ensure that the agency's resources are focused on preventing and remedying discrimination and advancing equal employment opportunity in circumstances where EEOC enforcement is most likely to achieve strategic impact. The EEOC will use all its tools, including enforcement (including investigations, settlements, and litigation), education and outreach, research, and policy development, to advance the agency's priorities.

---

5  *Systemic Task Force Report to the Chair of the Equal Employment Opportunity Commission*, at 1.

The Commission relied on the following criteria to identify subject matter priorities for this SEP:

1. Issues that will have **broad impact** because of the nature and scope of the employment practices addressed, the number of individuals impacted, or the employers or industries affected;

2. Issues **affecting workers who may be unaware of their legal rights** or reluctant or unable to exercise their rights;

3. Issues involving **developing areas of the law**, where the Commission's expertise is particularly valuable;

4. Issues involving policies or practices that **impede or impair full enforcement of federal employment discrimination laws**; and

5. Issues that may be **best addressed by government action, including enforcement**, based on the nature of the claim, the types of relief available, practical or legal impediments to private enforcement, or the Commission's access to information, data, and research.

## C.  SUBJECT MATTER PRIORITIES

The following are the EEOC's subject matter priorities for Fiscal Years 2024–2028:

### 1.  ELIMINATING BARRIERS IN RECRUITMENT AND HIRING

The EEOC will focus on recruitment and hiring practices and policies that discriminate on any basis unlawful under the statutes EEOC enforces, including sex, race, national origin, color, religion, age, and disability. These include:

- the use of technology, including artificial intelligence and machine learning, to target job advertisements, recruit applicants, or make or assist in hiring decisions where such systems intentionally exclude or adversely impact protected groups;

- job advertisements that exclude or discourage certain protected groups from applying;

- channeling, steering or segregating individuals into specific jobs or job duties based on protected characteristics;

- policies and practices that limit access to on-the-job training, pre-apprenticeship or apprenticeship programs, temp-to-hire positions, internships, or other job training or advancement opportunities based on protected characteristics;

- policies and practices that limit employees exclusively to temporary work on a basis prohibited by federal employment laws when permanent positions are available for which they are qualified;

- reliance on restrictive application processes or systems, including online systems that are difficult for individuals with disabilities or other protected groups to access; and

- the use of screening tools or requirements that disproportionately impact workers on a protected basis, including those facilitated by artificial intelligence or other automated systems, pre-employment tests, and background checks.

The continued underrepresentation of women and workers of color in certain industries and sectors (for example, construction and manufacturing, high tech, STEM, and finance, among others), are also areas of particular concern, especially in industries that benefit from substantial federal investment.

## 2. PROTECTING VULNERABLE WORKERS AND PERSONS FROM UNDERSERVED COMMUNITIES FROM EMPLOYMENT DISCRIMINATION

The EEOC will focus on harassment, retaliation, job segregation, labor trafficking, discriminatory pay, disparate working conditions, and other policies and practices that impact particularly vulnerable workers and persons from underserved communities. With respect to employment discrimination, the Commission views the category of vulnerable workers as including:

- immigrant and migrant workers and workers on temporary visas;

- people with developmental or intellectual disabilities;

- workers with mental health related disabilities;

- individuals with arrest or conviction records;

- LGBTQI+ individuals;

- temporary workers;

- older workers;

- individuals employed in low wage jobs, including teenage workers employed in such jobs;

- survivors of gender-based violence;

- Native Americans/Alaska Natives; and

- persons with limited literacy or English proficiency.

These workers may be unaware of their rights under equal employment opportunity laws, may be reluctant or unable to exercise their legally protected rights, and/or have historically been underserved by federal employment discrimination protections. Factors such as immigration status, language barriers, education level, poverty and/or economic circumstances, geographic location, isolated work conditions, age, disability status, societal stigma, or lack of employment experience can make these workers particularly vulnerable to discriminatory practices or policies.[6]

To implement this priority, district offices and the agency's federal sector program will identify vulnerable workers and underserved communities in their districts or within the federal sector for focused attention, based on their assessment of how the EEOC can most effectively utilize its resources to address issues of concern for these groups. For example, employment discrimination against Native Americans/Alaska Natives, indigenous people from Latin America, agricultural workers, workers on temporary visas, or individuals with arrest or conviction records might be areas of focus as part of this priority.

### 3.  ADDRESSING SELECTED EMERGING AND DEVELOPING ISSUES

The EEOC will continue to prioritize issues that may be emerging or developing, including issues that involve new or developing legal concepts or topics that are difficult or complex. The agency is uniquely suited to address these issues given the EEOC's research, data collection, receipt of charges in the private and public sectors, adjudication of complaints and oversight in the federal sector, and ongoing engagement with stakeholders.

Because of the nature of this priority category, the Commission may add or remove issues through interim amendments to the SEP. The following issues currently fall within this category:

a)   Qualification standards and inflexible policies or practices that discriminate against individuals with disabilities

b)   Protecting workers affected by pregnancy, childbirth, or related medical conditions under the Pregnancy Discrimination Act (PDA) and the Pregnant Workers Fairness Act (PWFA), as well as pregnancy-related disabilities under the Americans with Disabilities Act (ADA)

c)   Addressing discrimination influenced by or arising as backlash in response to local, national, or global events, including discriminatory bias arising as a result of recurring historical prejudices

---

6  The agency's 2013–2016 and 2017–2021 SEPs included sex discrimination against LGBTQI+ individuals as an emerging and developing issue. In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court affirmed — as the EEOC had held several years earlier — that Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sexual orientation or gender identity. Although Title VII's coverage of sexual orientation and gender identity discrimination has been settled by the Supreme Court and thus is no longer an emerging legal issue, preventing and remedying discrimination against LGBTQI+ individuals remain a key priority for the EEOC, as such individuals are often vulnerable and have historically been underserved. The Commission has therefore included LGBTQI+ individuals in the vulnerable and underserved worker priority.

For example, discrimination, bias, and hate directed against religious minorities (including antisemitism and Islamophobia), racial or ethnic groups, and LGBTQI+ individuals may fall within this subcategory. The discriminatory practices or affected groups or individuals may change during the time period covered by this SEP.

d)  Employment discrimination associated with the long-term effects of the COVID-19 pandemic, including Long COVID

e)  Technology-related employment discrimination

The EEOC will focus on employment decisions, practices, or policies in which covered entities' use of technology contributes to discrimination based on a protected characteristic. These may include, for example, the use of software that incorporates algorithmic decision-making or machine learning, including artificial intelligence; use of automated recruitment, selection, or production and performance management tools; or other existing or emerging technological tools used in employment decisions.

## 4. ADVANCING EQUAL PAY FOR ALL WORKERS

The EEOC will continue to focus on combatting pay discrimination in all its forms — on the basis of sex under the Equal Pay Act and Title VII, on other protected bases covered by federal anti-discrimination laws, including race, national origin, disability, and age, and at the intersection of protected bases. Because many workers do not know how their pay compares to their coworkers' and, therefore, are less likely to discover and report pay discrimination, the Commission will continue to use directed investigations and Commissioner Charges, as appropriate, to facilitate enforcement.

The Commission will also focus on employer practices that may impede equal pay or contribute to pay disparities and may lead to violations of statutes the Commission enforces, such as pay secrecy policies, discouraging or prohibiting workers from asking about pay or sharing their pay with coworkers, and reliance on past salary history or applicants' salary expectations to set pay.

## 5. PRESERVING ACCESS TO THE LEGAL SYSTEM

The EEOC will focus on policies and practices that limit substantive rights, discourage or prohibit individuals from exercising their rights under employment discrimination statutes, or impede the EEOC's investigative or enforcement efforts. For example, this priority includes policies or practices that deter or prohibit filing charges with the EEOC or cooperating freely in EEOC investigations or litigation. Specifically, the EEOC will focus on:

a)  overly broad waivers, releases, non-disclosure agreements, or non-disparagement agreements;

b)  unlawful, unenforceable, or otherwise improper mandatory arbitration provisions;

c)  employers' failure to keep applicant and employee data and records required by statute or EEOC regulations; and

d)    retaliatory practices that could dissuade employees from exercising their rights under employment discrimination laws. This subcategory focuses on retaliatory practices that detrimentally impact or otherwise affect employees beyond those engaging in protected activity.

## 6. PREVENTING AND REMEDYING SYSTEMIC HARASSMENT

Harassment, both in-person and online, remains a serious issue in our nation's workplaces. Over 34 percent of the charges of employment discrimination the EEOC received between FY 2018 and FY 2022 included an allegation of harassment, and harassment charges increased in FY 2022.[7] In the federal sector, 47 percent of appeals received between FY 2018 and FY 2022 included an allegation of harassment, and the total number of harassment charges increased in FY 2022. The EEOC will continue to focus on combatting systemic harassment in all forms and on all bases — including sexual harassment and harassment based on race, disability, age, national origin, religion, color, sex (including pregnancy, childbirth, or related medical conditions, gender identity, and sexual orientation) or a combination or intersection of any of these. With respect to charges and litigation, a claim by an individual or small group may fall within this priority if it is related to a widespread pattern or practice of harassment.

To combat this persistent problem, the EEOC will continue to focus on strong enforcement with appropriate monetary relief and targeted equitable relief to prevent future harassment. The EEOC will also focus on promoting comprehensive anti-harassment programs and practices, including training tailored to the employer's workplace and workforce, using all available agency tools, including outreach, education, technical assistance, and policy guidance.

## D. District and Federal Sector-Specific Priorities

The subject matter priorities set forth in the SEP are intended to be broad enough to encompass the needs and priorities of the EEOC's field offices across the country and the federal sector. Nevertheless, district offices and the Office of Federal Operations may designate additional subject matter priorities for focused attention as needed to address unique or local issues.

## E. Implementing SEP priorities

To maximize the agency's effectiveness, the EEOC's resources must align with its priorities. The following guidelines are intended to ensure that cases and matters that advance SEP subject matter priorities, as well as other charges and cases that have strategic impact, receive the attention and resources needed to advance equal opportunity and prevent and remedy discrimination in the workplace.

---

7   Total harassment charges increased from 21,270 in FY2021 to 24,430 in FY2022. Sexual harassment charges increased from 5,581 in FY2021 to 6,201 in FY2022 and race harassment charges increased from 7,755 in FY2021 to 8,524 in FY2022. *See* Enforcement and Litigation Statistics | U.S. Equal Employment Opportunity Commission (eeoc.gov). For federal agencies, total harassment charges increased from 6,541 in FY2021 to 7,590 in FY2022.

The EEOC will use SEP priorities to inform charge prioritization, selection of litigation and amicus briefs, federal sector enforcement, and all other activities across the agency including guidance, outreach, and research. The agency will also continue to pursue matters and issues that are not identified as SEP priorities where EEOC enforcement will have a strategic impact.

## 1. Charge Prioritization

Since at least 1995, the Commission has categorized charges for priority handling based on the likelihood of an investigation resulting in a finding of reasonable cause to believe that discrimination has occurred. Charge prioritization is a continuous process that occurs throughout the life of a charge; in each case, the investigation should be appropriate to the charge, taking into account the EEOC's resources.[8] Because the demand for the EEOC's services still far exceeds the agency's resources, the Commission must continue to strategically leverage its finite resources to best serve the public and most effectively achieve the goals of the statutes it is charged with enforcing. Clearly defined priorities enable the EEOC to focus resources where government enforcement is most needed and can deliver the greatest impact. Accordingly, a potentially meritorious charge that raises an SEP priority or is likely to have strategic impact should receive priority in charge handling consistent with longstanding procedures.

## 2. Litigation Program

The EEOC's litigation program is a critical tool in the agency's efforts to prevent and remedy unlawful employment discrimination and enforce civil rights in the workplace. In developing and selecting cases for litigation, the Office of General Counsel should prioritize meritorious cases that raise SEP priorities or are otherwise likely to have strategic impact. SEP priorities should also be considered in selecting cases for amicus curiae participation.

The Commission encourages the General Counsel, District Directors, and Regional Attorneys to continue to collaborate with the private bar, industry liaison groups, non-profit organizations, the Department of Justice, the Office of Federal Contract Compliance Programs, and the EEOC's other federal, state, and local partners to ensure efficient coordination and support their critical roles in protecting civil rights and ensuring compliance with employment discrimination laws.

## 3. Systemic Program

Eradicating systemic discrimination has long been one of the EEOC's top priorities, as underscored in the Systemic Task Force Recommendations of 2006, and reaffirmed in EEOC's 2016 review of the Systemic Program, "Advancing Opportunity — A Review of the Systemic Program of the U.S. Equal Employment Opportunity Commission," and in each of the EEOC's prior Strategic Enforcement Plans. The Commission once again reaffirms its commitment to the agency's systemic program as fundamental to advancing the agency's mission to prevent and remedy unlawful employment discrimination and advance equal opportunity for all.

---

8   Priority Charge Handling Procedures, at 2 (June 1995).

The agency will use the SEP priorities to guide the types of systemic investigations and cases to be pursued by the Commission at the national and local levels. Meritorious systemic charges and cases that raise SEP priorities should be given precedence over other cases to maximize the EEOC's strategic impact.

### 4. Alternative Dispute Resolution Program

As the Strategic Enforcement Plan focuses resources on SEP priorities, Alternative Dispute Resolution (ADR) continues to be an important tool to provide service to the public and promote timely resolution of discrimination charges against private, state, and local employers as well as complaints in the federal sector. The EEOC's ADR program provides an opportunity for individuals filing charges or complaints of discrimination and employers to convene and discuss their respective positions with a neutral mediator. Successful mediations resolve charges and complaints early in the process, benefiting both workers and employers and conserving agency resources. Independent studies of the EEOC's mediation program report that participants view the program as highly effective, fair, and neutral, and expressed strong satisfaction with the process. The studies also found "near unanimity" in participants' willingness to participate in the EEOC's mediation program in the future. The Commission encourages ADR as an effective and efficient tool to resolve charges and complaints of discrimination.

### 5. Federal Sector Hearings, Appeals, Oversight and Outreach

The SEP priorities serve several purposes in the federal sector. First, cases that raise these priorities alert the Commission to the potential need for more extensive legal analysis in federal sector appellate decisions, which also could serve as persuasive authority on related issues in the federal courts. Second, the EEOC's federal sector program is responsible for outreach and training to support oversight of federal agency EEO programs. Third, identifying SEP priorities in hearings and appeals provides the EEOC with information about trends in legal or factual issues to support federal sector outreach, training, compliance reviews, and program evaluations.

## F. Other Priorities

Chair initiatives should complement, rather than replace, SEP priorities.



# III. Principle Two: Integrating Efforts Across EEOC

As noted above, the Commission is committed to an integrated approach at the agency that promotes collaboration, coordination, and information sharing throughout the agency, beginning with the following requirements:

## A. Integrating Administrative Enforcement and Legal Enforcement in the Public and Private Sectors

Generally, the Commission has a statutory responsibility to receive, investigate, and attempt to resolve charges of discrimination filed against private sector and state and local employers.[9] If the Commission determines there is reasonable cause to believe discrimination has occurred, the agency attempts to end the alleged unlawful practice through an informal and confidential process known as conciliation. If conciliation is unsuccessful, the Commission has the authority to sue private entities under Title VII, Title I of the ADA, the PWFA, and Title II of GINA. (The Department of Justice has public sector litigation authority under these statutes). The EEOC has the authority to sue both public and private entities under the Equal Pay Act and the ADEA.

Having a seamless, integrated effort between the enforcement unit staff who investigate and conciliate discrimination charges and the legal staff who litigate cases on behalf of the Commission is critical for the agency's work to have significant impact and to provide excellent service to the public. To establish a baseline of consistency across all offices, the SEP requires:

### 1. Legal-Enforcement Interaction

The Commission reaffirms the importance of regular and meaningful consultation and collaboration between investigative and legal staff throughout investigations and conciliations. Effective administrative and court enforcement of workplace civil rights laws requires that the EEOC's investigative and legal staff communicate and work together to best achieve the EEOC's mission.

The Commission commends the collaboration between administrative and legal enforcement that exists in many offices and encourages headquarters and field office legal and investigative staff to continue to enhance these important partnerships.

---

9 The EEOC does not have a statutory duty to investigate under the Equal Pay Act or the Age Discrimination in Employment Act and the Equal Pay Act does not require conciliation.

### 2. Coordination of Systemic Enforcement

Effective systemic enforcement requires communication and collaboration between the EEOC's legal and enforcement units, between headquarters and the field, and across EEOC districts. The Commission encourages cross-district and agency-wide collaboration, consultation, and strategic partnerships to avoid duplicating efforts, promote efficiency, and maximize the impact of the EEOC's systemic program.

### B. Integrating Federal Sector Activities

The goal of advancing equal opportunity applies in the federal and private sectors, as does the principle of integrated strategies. The Commission encourages the Office of Federal Operations and the Office of Field Programs to continue enhanced communication and coordination within the federal sector. The EEOC's federal sector activities includes its hearings program; appellate program; oversight; and education, training, and outreach programs. It is critical that the Commission leverage its authority and integrate its activities in the federal sector to help federal agencies achieve and maintain "Model EEO Program" status, as mandated by Congress.

### C. Integrating Education and Outreach Activities

Clear and accessible information is critical to preventing discrimination, promoting compliance with federal EEO laws, and informing individuals of their rights. Investigations, conciliations, and litigation are only some of the means that the EEOC uses to fulfill its mission and vision. Education and outreach programs, as well as regulations, guidance, and training materials, are also cost-effective law enforcement tools because they promote understanding of the law and voluntary compliance. To ensure the public has easy access to information and technical assistance from the EEOC and that the agency is fully integrating the SEP priorities into its education and outreach efforts, the Commission adopts the following strategies:

- **Providing up-to-date, accessible guidance on the requirements of employment discrimination laws**

  The EEOC's FY 2022–2026 Strategic Plan recognizes the importance of preventing employment discrimination and advancing equal employment opportunity through outreach and education. In furtherance of this important objective, the EEOC is focused on efforts to ensure that members of the public are aware of employment discrimination laws and have access to the EEOC's services, that jobseekers and workers know their rights, and that employers, federal agencies, unions, and staffing agencies know their responsibilities under these laws and have the information and resources to advance equal employment opportunity, prevent discrimination, and effectively resolve EEO issues. The EEOC is focused on developing and updating its regulations, guidance, training materials, and other information it provides to the public to ensure that applicants, employees, employers, and members of the public are aware of their rights and responsibilities.

To fully integrate education and outreach activities with the EEOC's SEP priorities, the agency commits to leveraging technology, analytics, the EEOC's language access plan, and innovative outreach strategies to provide the public, including hard to reach communities and those who lack ready access to EEOC resources, greater access to information about their rights and responsibilities. The EEOC will also provide technical assistance to under-served segments of the employer community, including small, new, and disadvantaged businesses. By using these additional resources, the agency will be better equipped to ensure that information and training provided to the public advances the agency's priorities.

- **Promoting promising practices to help prevent discrimination in the workplace**

The Commission commits to integrating the SEP priorities into its education and outreach activities by promoting promising practices for employers to help prevent discrimination from occurring. These resources and leading practices will enable all employers to adopt policies and practices to help prevent employment discrimination and advance equal employment opportunity.

To further those objectives, the EEOC will support employer efforts to implement lawful and appropriate diversity, equity, inclusion, and accessibility (DEIA) practices that proactively identify and address barriers to equal employment opportunity, help employers cultivate a diverse pool of qualified workers, and foster inclusive workplaces.

### D. Integrating Research, Data, and Analytics

Collecting and analyzing data is central to the EEOC's enforcement and educational efforts. The EEOC recognizes the importance of data-driven decision-making and the transformative role data can have to make the EEOC more effective in advancing its priorities and serving the public. Since 2018, with the creation of the Office of Enterprise Data and Analytics (OEDA), the Commission has made significant investments in upgrading its ability to collect and use quality data. The EEOC will continue to build its capacity to provide mission-critical evidence and better integrate its information and data policy with the agency's SEP priorities.

### E. Collaborating with State and Local Fair Employment Practices Agencies and Tribal Employment Rights Offices

State and local Fair Employment Practices Agencies (FEPAs) and Tribal Employment Rights Offices (TEROs) are critical partners in the EEOC's enforcement of equal employment opportunity laws. The EEOC contracts with FEPAs nationwide to process about 35,000 employment discrimination charges each year. Through a dual-filing process made possible by work-sharing agreements, the agencies avoid duplicating work and make it easier for the public to file charges of discrimination. The EEOC and FEPAs also collaborate in various activities, including investigations, internal training, and outreach events. Similarly, the EEOC partners with TEROs

to promote equal employment opportunity on or near Native American/Alaska Native reservations or tribal lands. The TEROs also collaborate with the EEOC by completing interview questionnaire forms for potential charging parties and forwarding them to EEOC field offices.

The EEOC district offices, FEPAs, and TEROs will continue to identify areas for collaboration based on the SEP priorities and the needs in their specific jurisdictions to benefit the public. These areas of collaboration may include, but are not limited to, outreach events and listening sessions with stakeholders to discuss SEP priorities. The district offices will review the effectiveness of the joint activities on an annual basis and adjust as needed.

### F.  Supporting Private Enforcement of the Federal Anti-Discrimination Laws

The Commission has an obligation to ensure meaningful legal protections for individuals while also effectively using its resources to have the greatest impact. Given its limited resources, the EEOC litigates only a small percentage of reasonable cause findings where conciliation efforts have failed. EEOC staff may share with the parties, to the extent permitted under the law and as appropriate, information to facilitate swift enforcement and early resolution of charges. To better assist individuals whose charges are not settled or litigated by the EEOC, district offices will provide information to individuals who seek to contact employment law attorneys for further assistance.

### G.  Collaborating with Other Federal Agencies

The EEOC is the government's lead agency on equal employment opportunity. However, as previously noted, the Department of Justice, the Department of Labor, and other federal agencies also play important roles in enforcing laws prohibiting employment discrimination. The Commission will continue to collaborate with our sister agencies to further our mission.



# IV. Principle Three: Delivery of Results

To ensure that the EEOC is achieving results in accordance with the priorities set forth in the SEP, program offices will report progress to the Commission at semi-annual briefings as follows:

- The **Office of Field Programs** will report on enforcement activities and outreach, education, and training involving SEP priorities.

- The **Office of General Counsel** will report on litigation involving SEP priorities.

- The **Office of Federal Operations** will report on federal sector activities involving SEP priorities.

The midyear briefing will cover the first and second quarters of the fiscal year, and the annual briefing will cover all four quarters.

## Effective Date

The SEP is effective the day following approval by the Commission and will remain in effect until superseded, modified or withdrawn by vote of a majority of members of the Commission.

## Acknowledgments

The Commission extends its thanks to everyone who participated in the development of the draft SEP, especially the members of the EEOC Strategic Planning Work Group and the SEP Subgroup. The Commission also thanks the EEOC staff who provided feedback on the SEP, the nearly three dozen witnesses who addressed the Commission at the three public listening sessions, and members of the public who submitted comments on the SEP through the dedicated inbox and via regulations.gov.

# Appendix A — EEOC National Strategic Enforcement Plan Subgroup

## Leadership

Elizabeth Fox-Solomon, Chief of Staff, Office of the Chair (Chair)

Thomas Colclough, Director, Field Management Programs, Office of Field Programs (Co-Chair)

## Members

Carlton Hadden, Director, Office of Federal Operations

Colleen Hampton-Lyster, Director, Advice, Audits, and External Reports Division, Office of Communications and Legislative Affairs

Mandana Massjouni, Director, Enterprise Application and Innovation Division, Office of the Chief Information Officer

Andrew Rogers, Chief Counsel, Office of Commissioner Lucas

Jerome Scanlon, Assistant General Counsel, Office of General Counsel

Lisa Schnall, Senior Attorney-Advisor, Office of Legal Counsel

## Ex Officio Members

Cynthia G. Pierre, Ph.D., Chief Operating Officer and Chief Performance Improvement Officer, Office of the Chair

Brett Brenner, Acting Deputy Chief Operating Officer, Office of the Chair

## Key Staff Support

Antoinette Eates, Chief of Staff, Office of the Vice Chair

Lucila Rosas, Attorney Advisor, Office of the Chair

# Appendix B — Strategic Enforcement Plan Public Listing Sessions

*SEP Listening Session 1*
*Advancing Racial and Economic Justice in the Workplace*

**August 22, 2022**
**Buffalo, NY**

## Witnesses

- Thomas Beauford, Jr., President and CEO, Buffalo Urban League

- Mark Blue, President, NAACP-Buffalo

- Trina Burruss, Chief Operating Officer, United Way of Buffalo and Erie County

- Zeneta Everhart, Community Advocate & Mother of Tops Shooting Victim

- Kimberly Hayward, Hospital Worker & Lead Plaintiff in Race Discrimination Suit

- Kelly Hernandez, Member of the Board of Directors, Hispanic Heritage Council of Western New York

- Maureen Kielt, Director, EEOC Buffalo Local Office

- Cindi McEachon, CEO, Peaceprints of Western New York (WNY)

- Brendan R. Mehaffy, Executive Director, City of Buffalo Office of Strategic Planning

- Clotilde Perez-Bode Dedecker, President and CEO, Community Foundation for Greater Buffalo

- John Somers, President and CEO, Harmac Medical Products, Inc.

- Henry Louis Taylor, Jr., Director, Center for Urban Studies, University at Buffalo

- Rolanda Ward, Associate Professor and Endowed Faculty Director of the Rose Bente Lee Ostapenko Center for Race, Equity, and Mission, Niagara University

- Garnell Whitfield, Jr. , Community Advocate & Son of Tops Shooting Victim

### *SEP Listening Session 2*
### *Identifying Vulnerable Workers and Reaching Underserved Communities*

**September 12, 2022**
**Virtual**

## Witnesses

- Ian Anderson, Legal Services Project Manager, Transgender Law Center

- Vidhi Bamzai, Staff Attorney, Southern Poverty law Center (SPLC)

- Marisa Diaz, Senior Staff Attorney, Legal Aid at Work

- Monica Guizar, Lead Counsel, Property Services Division of Service Employees International Union (SEIU)

- Julie Kegley, Senior Staff Attorney and Program Director, Georgia Advocacy Office

- Maria Lopez, Staff Attorney, Indigenous Program at California Rural Legal Assistance, Inc.

- Marisa Lundin, Legal Director, Indigenous Program at California Rural Legal Assistance, Inc.

- Chanchanit (Chancee) Martorell, Founder & Executive Director, Thai Community Development Center (Thai CDC)

- Blanca Rodriguez, Deputy Director of Advocacy, Columbia Legal Services

*SEP Listening Session 3*
***Shaping the EEOC's Strategic Enforcement Priorities***

**September 22, 2022**
**Washington, DC**

- Holly Biglow, Government Affairs Director, AARP

- Judi Conti, Director of Government Affairs, National Employment Law Project

- Linda Correia, President, National Employment Lawyers Association (NELA)

- Emily Dickens, Chief of Staff and Head of Government Affairs, Society for Human Resource Management (SHRM)

- David Fortney, Co-Founder, Fortney & Scott

- Darrell Gay, Partner, ArentFox Schiff

- Eve Hill, Partner, Brown Goldstein & Levy

- Manjusha Kulkarni, Executive Director, AAPI Equity Alliance

- Emily Martin, Vice President for Education and Workplace, National Women's Law Center

- Nick Reaves, Counsel, Becket

- Dariely Rodriguez, Deputy Chief Counsel, Lawyers Committee for Civil Rights Under Law

- Chris Williams, Director of Litigation, National Legal Advocacy Network



U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

131 M STREET NE
WASHINGTON, DC 20507
WWW.EEOC.GOV

# EXHIBIT C

**U.S. Equal Employment Opportunity Commission**

# Standards and Procedures for Settlement of EEOC Litigation

## TABLE OF CONTENTS

**A.    Civil Justice Reform**

**B.    Settlement Authorit**y

**1.    General Counsel**

**2.    Delegation of Settlement Authority to Regional Attorneys**

**3.    Cases on Appeal**

**C.    General Settlement Standards**

**1.    Form**

**2.    Scope**

**3.    Confidentiality and Other Prohibited Terms**

**4.    Press Releases**

**5.    Handling of Money**

**6.    Breach**

**7.    Successor Liability**

**8.    Compliance with Internal Revenue Code Section 162(f)**

**D.    Relief in the Broader Public Interest**

**1.    Injunctions**

**2.    Targeted Equitable Relief**

**3.    Customized Training**

**4.    Implementation of Policies**

**5.    Monitors**

**6.    Record Retention and Reporting**

**7.    Notice of Lawsuit and Settlement**

**E.    Victim-Specific Relief**

**1.    Consultation with Aggrieved Individuals Regarding Relief**

**2.    Individual Affirmative Relief**

**3.    Job References**

**4.    Monetary Relief Generally**

**5.    Claimant Releases**

**F.    Relief in Systemic Cases**

**1.    Determining Monetary Entitlement**

**2.    Monetary Relief for Non-Applicants in Hiring Cases**

**3.    Instatement, Goals, and Affirmative Recruitment Efforts**

**4.    Settlement Administration**

**5.    Reversions**

# A.    Civil Justice Reform

Executive Order 12988, 61 Fed. Reg. 4729 (Feb. 7, 1996), entitled "Civil Justice Reform," includes provisions intended to "facilitate just and efficient resolution of civil claims" brought by the federal government. It applies to EEOC Trial Attorneys assigned to a case and their supervisors, all of whom are "litigation counsel" within the meaning of the Order.

Section 1(a) of the Order requires an attempt at settlement prior to filing suit. The EEOC's conciliation process satisfies this requirement. Section 1(b) of the Order requires that, as soon as practicable after filing suit and throughout the litigation, litigation counsel should evaluate settlement possibilities. EEOC counsel should consider initiating settlement efforts soon after

filing if there appears any potential for resolving the suit without the need for taking any discovery. Counsel may make additional settlement efforts as the litigation progresses. Section 1(c)(1) of the Order directs litigation counsel to suggest use of an appropriate alternative dispute resolution (ADR) technique "[w]here the benefits of [ADR] may be derived." Litigation counsel is in the best position to determine whether it would be appropriate to use mediation in a particular case. Thus, the Regional Attorney has authority to agree to use mediation in any case.

# B.    Settlement Authority

## 1.    General Counsel

Congress assigned EEOC's General Counsel "responsibility for the conduct of litigation" for the agency. 42 U.S.C. § 2000e-4(b)(1). The General Counsel controls the agency's litigation, and thus has the authority to decide whether to settle EEOC lawsuits and on what terms. The General Counsel may delegate that authority to the Regional Attorney in any case or class of cases.

## 2.    Delegation of Settlement Authority to Regional Attorneys

The General Counsel delegates settlement authority to Regional Attorneys in all suits unless, upon authorizing litigation in the case, the General Counsel indicates that settlement authority is retained by the General Counsel. In any case where the General Counsel has retained settlement authority, the Regional Attorney cannot resolve the suit, or any claim in the suit, without approval of the General Counsel. In such cases, the General Counsel will make an independent review of the adequacy of the proposed settlement.

## 3.    Cases on Appeal

The General Counsel must approve all settlements of cases on appeal whether or not the Regional Attorney had settlement authority at the district court level. While a case is on appeal, Appellate has discretion, in consultation with the Regional Attorney, to engage in settlement efforts and to handle all settlement negotiations, including through court-ordered mediation.

# C.    General Settlement Standards

## 1.    Form

To ensure the enforceability of Commission lawsuit resolutions, the agency's practice is that district court settlements be in the form of a consent decree or consent judgment. A consent decree is a court order rather than a contract. Thus, the word "agree" should not be used in describing what a defendant must do or not do. All injunctive terms of a consent decree should read as the court prohibiting or requiring the conduct.

When a court reviews a proposed consent decree, the court generally "pay[s] deference to the judgment of the government agency" unless the settlement is "unfair, inadequate, or unreasonable." *SEC v. Randolph*, 736 F.2d 525, 529-30 (9th Cir. 1984) ("[t]he initial determination whether the consent decree is in the public interest is best left" to the agency negotiating the decree); *cf. Mach Mining, LLC v. EEOC*, 575 U.S. 480, 492 (2015) (noting that EEOC has wide "latitude . . . to pursue voluntary compliance with the law's commands").

## 2.    Scope

The consent decree must contain a statement that it resolves only the claims raised in the Commission's complaint. If the Commission has agreed to resolve additional claims, such as those contained in pending charges resolved by the decree, those other claims must be specifically identified. The decree should contain language reserving the Commission's right to file suit on any pending charges not explicitly resolved by the decree and on subsequently filed charges. Charging parties and other aggrieved individuals should not be signatories to the decree, as (with the exception of intervenors) they are not parties to the action.

## 3.    Confidentiality and Other Prohibited Terms

Once the Commission has filed suit, the agency will not enter into settlements that are subject to confidentiality provisions or any other restrictions on disclosure of the suit, facts or allegations relating to the suit, or the settlement or its terms by the EEOC, charging parties, or other aggrieved individuals. The principle of openness in government requires that the public have access to the results of the agency's litigation activities, so that it can assess whether the Commission is using its resources appropriately and effectively. Additionally, it is important for entities covered by federal employment discrimination laws to be aware of the agency's enforcement activities.

Therefore, resolutions of Commission suits must contain all settlement terms (including the total amount of any monetary recovery) and be filed in the public court record. The Commission must be free to respond fully to inquiries regarding the suit and resolution and to provide upon request the resolution documents and any nonprivileged, case-related documents. Commission attorneys must oppose attempts to seal or otherwise prevent public access to the consent decree. If, over the Commission's objections, a court issues an order preventing such access, the General Counsel will determine whether to appeal the order.

Resolutions of Commission suits must not contain provisions that chill or deter the exercise of protected rights or have the effect of diminishing an individual's rights. Accordingly, no consent decree resolving a Commission suit, or any associated documents, may require that any individual refrain from disparaging the defendant or entities related to the defendant, or refrain from seeking future employment with the defendant or related entities. Similarly, no consent decree resolving a Commission suit, or any associated documents, may require any individual to

agree to a shorter statute of limitations than that provided by statute for any future claims, to agree to refrain from filing future charges of employment discrimination with the EEOC or any other government agency, or to agree not to participate in a future EEOC investigation or otherwise communicate with the EEOC or any other government agency.

## 4.     Press Releases

The Commission's policy is to issue a press release upon settlement of a Commission suit. Issuing a press release is an important component of the Commission's responsibility to inform the public about its law enforcement activities. Neither the issuance nor the content of the press release should be the subject of negotiation.

## 5.     Handling of Money

Commission personnel may not assume responsibility for handling any monetary awards to any aggrieved individuals and may not distribute funds, in any form, that are intended for such individuals. Awards to individuals should be distributed by the defendant or a mutually agreed-upon third party. The costs of distribution, including the cost of any third-party claims administrator, should be borne by the defendant. Distribution costs must not be deducted from the award fund (or from interest on the fund). Monetary distribution tasks should be well-defined and subject to clear timeframes, and a procedure should be established for the Commission to verify that the required distributions took place.

## 6.     Breach

The consent decree should address how it will be enforced in the event of a defendant's failure to comply. Consent decrees often contain provisions that require the EEOC to notify the defendant and attempt informal resolution prior to seeking court intervention over an alleged breach of the decree. In addition to requiring notice of an alleged breach, these provisions typically provide the defendant a specified time in which to remedy its alleged non-compliance before the EEOC contacts the court. Notice-of-breach provisions should expressly provide for exceptions to the waiting period in situations where a delay in seeking court enforcement may cause harm to the Commission or aggrieved individuals.

Because the consent decree is a court order, the mechanism for court enforcement is a motion to enforce the consent decree and may also include an application for an order to show cause why the defendant should not be held in contempt for failure to comply with the consent decree. These motions may be premised on a breach of any material term of the decree, such as the defendant's failure to pay aggrieved individuals in a timely manner, failure to submit required reports to the EEOC, or failure to comply with an injunction. The EEOC may request various forms of relief in its motion, including the payment of attorney's fees and the court's extension of the duration of the decree to permit further monitoring (*see, e.g.*, *EEOC v. SuperValu*, No. 09-C-5637,

2014 U.S. Dist. LEXIS 169215 (N.D. Ill. Dec. 2, 2014)), and imposing a periodic monetary penalty until the defendant complies (*see, e.g.*, *EEOC v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 980 (D. Ariz. 2001)).

## 7.    Successor Liability

Successor entities may be held liable for the discriminatory practices of entities they have purchased or merged with. *See, e.g.*, *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898 (7th Cir. 2015); *EEOC v. MacMillan Bloedel Containers, Inc. and Local 544, United Paperworkers Int'l Union*, 503 F.2d 1086 (6th Cir. 1974). An important factor in establishing successor liability is notice (actual or constructive) of the claim to the subsequent employer prior to the transfer of ownership. To ensure that the obligations imposed by a settlement are carried out in the event of a transfer in ownership of the defendant, the consent decree should specify that the defendant will provide prior written notice to any potential successor, including any potential purchaser of all or a portion of the defendant's assets, of the Commission's lawsuit, the allegations raised in the Commission's complaint, and the existence and contents of the consent decree. The defendant should also be required to give notice to the EEOC when it has provided the information required by this section to a potential successor.

## 8.    Compliance with Internal Revenue Code Section 162(f)

Internal Revenue Code section 162(f) allows employers to deduct "certain amounts paid or incurred for restitution, remediation, or to come into compliance with a law." 26 U.S.C. § 162(f). It requires the EEOC to file an "information return" (Form 1098-F) with the IRS regarding amounts paid or incurred by the defendant for restitution, remediation, or to come into compliance with a law pursuant to a court order or agreement, where the EEOC expects that the total amount paid or incurred is $50,000 or more for backpay, front pay, compensatory damages, and/or targeted equitable relief which is likely to be a cost to the employer. Attorney's fees, costs, punitive damages, and liquidated damages are excluded.

To promote clarity and ensure compliance with section 162(f), the following language must be included in all EEOC consent decrees where the defendant is not a government or non-profit entity and the total expected cost (including targeted equitable relief) is $50,000 or more:

- The individual who should receive the copy of the Form 1098-F if the EEOC is required to issue one is: (Name and Physical Address)

- The EEOC has made no representations regarding whether the amount paid pursuant to this settlement qualifies for the deduction under the Internal Revenue Code.

- The provision of the Form 1098-F by the EEOC does not mean that the requirements to claim a deduction under the Internal Revenue Code have been met.

- Any decision about a deduction pursuant to the Internal Revenue Code will be made solely by the IRS with no input from the EEOC.

- The parties are not acting in reliance on any representations made by the EEOC regarding whether the amounts paid pursuant to this agreement qualify for a deduction under the Internal Revenue Code.

# D.   Relief in the Broader Public Interest

## 1.    Injunctions

Injunctions addressing future compliance with the law must be focused on the conduct and claims at issue in the case, and they should be drafted in a manner that ensures enforceability. Precision is necessary to comply with the letter and purpose of Federal Rule of Civil Procedure 65(d)(1), to provide the defendant with clear notice of what conduct may result in a finding of contempt. Thus, for example, language such as, "Defendant is enjoined from discriminating on the basis of sex, including excluding women from dockworker positions" is unhelpfully broad despite the reference to the claim. Strong, direct language should be used in prohibitory injunctions.

Injunctions should not contain affirmations of a defendant's prior or ongoing legal conduct, such as "defendant will continue to comply with Title VII" or "defendant restates its policy of nondiscrimination in employment." A defendant's statements of continuing legal conduct will not be accepted in place of explicit injunctive provisions requiring future compliance with the law.

## 2.    Targeted Equitable Relief

The **EEOC's 2022-2026 Strategic Plan (https://www.eeoc.gov/eeoc-strategic-plan-2022-2026)** places a high priority on obtaining targeted equitable relief in the agency's resolutions. According to the Plan, "[t]argeted, equitable relief means any non-monetary and non-generic relief (other than the posting of notices in the workplace about the case and its resolution), which explicitly addresses the discriminatory employment practices at issue in the case, and which provides remedies to the aggrieved individuals or prevents similar violations in the future. Such relief may include customized training for supervisors and employees, development of policies and practices to deter future discrimination, and external monitoring of employer actions, as appropriate."

Consent decrees should contain various forms of targeted equitable relief, as appropriate to the case and the individual employer. Every case should be treated as unique and contain carefully drafted provisions designed to provide full redress for the discriminatory practices at issue and to minimize the likelihood of their recurrence. By way of example only, it may be appropriate to include provisions for a defendant to: discipline an alleged discriminating official or harasser;

issue a written apology to an aggrieved individual; provide a job coach, American Sign Language
interpreter, or other accommodation for an aggrieved individual; provide for psychological counseling for an aggrieved individual; analyze and, as appropriate, revise its job descriptions; establish a complaint hotline or engage a professional third party to assist in receiving or handling complaints; conduct a pay equity audit or workplace climate surveys; or take other non-monetary measures tailored to the violations alleged in the case.

The elements of targeted equitable relief should be specific, feasible, and crafted to ensure accountability for the defendant. A defendant's obligations under the decree should include clear deadlines. In addition, the decree should specify the mode and timing of dissemination of policies or procedures required by the decree, and it should ensure that such documents are accessible to applicants and/or employees (i.e., disseminated through modalities where employees and applicants are likely to encounter them, and in languages used by the workforce and applicant pool, including ASL) to have the intended effect. Equitable relief provisions should be drafted and negotiated bearing in mind the size of the employer, the common methods of communication between the employer and its workforce or applicant pool, and any other factors that might impact the effectiveness of the relief.

## 3.     Customized Training

Training should be tailored to the defendant's workplace and workforce, as well as to the allegations in the lawsuit. Training should be designed to increase awareness of the type of conduct that could violate the law. It should include clear information on how and to whom to report inappropriate conduct, whether witnessed or experienced directly. It should also emphasize that retaliation of any kind against an employee who reports such conduct is prohibited and will result in disciplinary action.

Training should be conducted for all employees, with targeted training to managers/supervisors and human resources staff. First- and middle-level managers should receive training on how to recognize, respond to, and report unacceptable conduct. It should be made clear to all staff with supervisory responsibilities that it is a requirement of their position to report, to initiate, or to take corrective action regarding any objectionable conduct of which they become aware, regardless of whether the person engaging in the conduct is in their line of authority or whether anyone has complained to them about or asked them to correct the conduct. Individuals tasked with investigating complaints of inappropriate workplace conduct should be adequately trained on how to conduct such investigations. Trainers, training content, and training format should be identified with specificity in the decree and should be subject to EEOC approval. EEOC representatives should also have the option of attending the training.

Where appropriate, each training program should begin with a message from a senior executive that the employer considers discrimination, harassment, retaliation, and any offensive conduct in the workplace unacceptable, and that defendant is committed to preventing such conduct and

remedying it quickly if it occurs. Where feasible, it is a best practice to have the executive attend and participate in the program. Training should occur regularly throughout the duration of the decree. It is a best practice to obtain evaluations at various intervals following the training, asking participants whether the training has affected their behavior or the behavior of others in the workplace. Additional ideas for effective training related to antidiscrimination, antiharassment, and antiretaliation can be found in **EEOC's Select Task Force Report on the Study of Harassment in the Workplace (https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686310)** .

## 4.      Implementation of Policies

The consent decree should include provisions concerning the implementation of policies that fully address what caused or enabled the discrimination alleged in the complaint. For example, in harassment cases, policies and complaint procedures addressing prohibited conduct should be created or revised if needed. In hiring and promotion cases where a defendant's selection procedures are alleged to have contributed to the exclusion of members of the protected class, the procedures should be revised to eliminate their discriminatory effects. Where a defendant has no antidiscrimination, antiharassment, reasonable accommodation, or antiretaliation policy (whichever is at issue), the defendant should be required to create and implement one.

Where a defendant's policies or procedures require revision, the EEOC should not draft the policy but should instead advise the defendant during negotiations of insufficient content. Additional ideas and guidance on the development of effective policies related to antidiscrimination, antiharassment, and antiretaliation can be found in **EEOC's Select Task Force Report on the Study of Harassment in the Workplace (https://www.eeoc.gov/select-task-force-study-harassment-workplace)** .

## 5.      Monitors

Whenever a monitor is appropriate, the monitor should have the authority to review relevant documents, speak to employees and EEOC staff, and otherwise be provided the resources necessary for an effective review of the defendant's compliance with the terms of the consent decree. Monitors should be approved by the EEOC, and the costs associated with monitoring should be borne by the defendant. The decree should require the defendant's implementation of the monitor's recommendations subject only to a contrary court order. The decree should also provide a mechanism for securing a qualified replacement acceptable to the EEOC if the monitor is unable to complete required tasks. In some cases, the EEOC may agree that a current employee of the defendant, acceptable to the EEOC, may monitor compliance with the consent decree. This must not be an individual alleged to have been complicit in the discrimination. The individual must have the knowledge, ability, and authority to ensure compliance with the requirements of the decree. In some instances, it may be appropriate to include regular, formal audits as a term of the decree, with the results reported to the EEOC.

Where appropriate, decrees should permit visits to the defendant's facility by EEOC staff or their designee upon reasonable notice. The scope of permissible EEOC staff conduct during visits — such as the extent of their examination of the premises and their ability to speak to employees and managers selected randomly – should depend on the violations at issue and the requirements under the decree.

## 6.      Record Retention and Reporting

The consent decree should describe with as much specificity as possible the records a defendant must retain during (and where applicable, after) the term of the decree. The decree should also contain provisions permitting the Commission to inspect or require production of relevant documents, whether or not the information was identified among the records the decree requires the defendant to retain, and to interview employees, including managers, who may possess relevant information.

The decree should require that information necessary for ongoing monitoring of the defendant's compliance be submitted to the Commission on a periodic basis. Reporting on all activities required under the decree is essential to the EEOC's ability to examine the defendant's compliance and take timely enforcement action where necessary. Decrees should include reporting provisions to ensure compliance with any required relief for aggrieved individuals and targeted equitable relief. Reporting should include, as appropriate: internal discrimination or harassment complaints and personal contact information for those who made such complaints; information related to requests for reasonable accommodation; the defendant's actions taken on internal complaints and accommodation requests; information on pay determinations; information reflecting applicant flow and hiring decisions; and charges filed with the EEOC or other government entities. Decrees may also provide for the EEOC's ability to review the defendant's internal investigations and the defendant's efforts to comply with decree requirements such as audits (for example, of hiring decisions where goals have not been met), employee surveys, and exit interviews.

When discrimination has been inferred based on a statistical disparity, decrees should describe, with as much specificity as possible, the data that must be provided to allow for monitoring by the EEOC or an outside monitor. The decree should outline what fields will be in the database and the electronic format of the data file. Decrees should also specify the metrics for determining compliance – for example, in meeting hiring or promotion goals, the absence of any shortfall, or at a minimum, that any shortfall is not statistically significant (e.g., is less than two standard deviations) when using the appropriate statistical test.

## 7.      Notice of Lawsuit and Settlement

The decree should require that a defendant post in a physical and/or electronic area where the defendant's notices are commonly displayed for its employees, or otherwise distribute, an

accessible notice of the lawsuit and settlement. For many workplaces, electronic posting of notices is the superior method. The purpose of the notice is to inform employees of their rights and responsibilities under the relevant antidiscrimination law(s) and the consent decree. The notice should, in layperson's language, set forth the claims resolved in the case, the requirements of the relevant law(s), the general terms of the consent decree, and EEOC contact information in case of questions. The notice should not contain any denials by a defendant. The notice should be written in languages and on media calculated to make the information accessible to the defendant's employees. In the case of limited-literacy workforces, video recitations of the notice should be considered, including videos with simultaneous ASL interpretation.

# E.    Victim-Specific Relief

## 1.    Consultation with Aggrieved Individuals Regarding Relief

Although the EEOC determines appropriate relief in suits it files, the EEOC consults charging parties and other aggrieved individuals regarding relief the Commission is considering accepting and notifies them of the relief they will receive in the settlement. Exceptions to these requirements can be made in matters involving large numbers of, or currently unknown, aggrieved individuals. However, charging parties should always be consulted before the EEOC accepts relief offers.

Even where a charging party or other aggrieved individual is represented by private counsel, the Commission retains the authority to accept or reject any settlement terms or conditions for the EEOC's claims, consistent with its statutory authority and the settlement standards set out herein. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002) (rejecting the notion that the EEOC's "prayer for relief could be dictated by" a charging party, and stating that "once a charge is filed, the exact opposite is true under the statute - the EEOC is in command of the process"). Nothing in this document is intended to limit or interfere with an individual's right to obtain and receive private representation.

## 2.    Individual Affirmative Relief

Individual affirmative relief, such as instatement, reinstatement (or front pay in lieu thereof), wage increases, promotions, transfers, and job training, should be sought in all cases where applicable. Also, where applicable, relief should include retroactive seniority and any other lost benefits, such as pension accruals. Individual affirmative relief should be sought absent strong countervailing reasons, as it is important for the effective enforcement of discrimination laws that those harmed by discrimination attain their rightful place in the workforce.

**3.** **Job References**

For individuals who were employed by the defendant, it is important to secure as positive a reference as the defendant can honestly provide. Where the parties agree to a reference containing only basic employment information (such as dates of employment and position), and the defendant has had a policy of providing only such information, the EEOC should obtain the defendant's agreement to include a statement of the policy with the reference. Where possible, references should contain a statement that the individual is eligible for rehire.

## 4.      Monetary Relief Generally

Monetary relief on Commission claims can be allocated to backpay, interest, front pay, compensatory and punitive damages, and liquidated damages, in accordance with the agreement of the parties, so long as the particular relief is authorized under the statute(s) under which the case was brought and the allocations are reasonably related to the harm or loss caused by the discriminatory conduct. Required withholdings should be made from backpay, and it should be made clear at the time of agreement on backpay that the amount is exclusive of the employer's share of Social Security and Medicare contributions. Other forms of monetary relief are also taxable, but there should be no withholding. Employers should issue an IRS W-2 form in connection with all backpay and front pay awards to all individuals receiving such awards, and an IRS 1099 form in connection with all awards for interest and compensatory, punitive, and liquidated damages. Employers should provide copies of these forms to the EEOC. EEOC attorneys do not provide advice on tax consequences. A discussion of monetary relief in systemic matters is below at section F.1.

## 5.      Claimant Releases

As a condition of obtaining relief on a Commission claim, claimants may release their right to recover for any claims against the defendant arising under the same facts and statute(s) and comprising the same violation(s) as were alleged in the EEOC's lawsuit.

Model release language is as follows:

In consideration for and effective upon my receipt of $ _____ in connection with the resolution of EEOC v. _____, I waive my right to recover for any claims of [bases and issues] arising under [statute(s)] that I had against _____ prior to the date of this release and that were included in the violations alleged in the EEOC's complaint in EEOC v. _____.

However, the Commission will not permit a release that contravenes public policy or diminishes an individual's rights. *See Gen. Telephone Co. of the Northwest v. EEOC*, 446 U.S. 318, 325-26 (1980) (recognizing that Congress gave the Commission litigation authority in 1972, in part, to "bring about more effective enforcement of private rights").

As noted above at section E.1, nothing in this document is intended to limit or interfere with an individual's right to obtain and receive private representation. Further, where the agreement is knowing, voluntary, and otherwise lawful, the EEOC acknowledges that a represented claimant may agree to waive or release, for separate consideration, additional legal claims against the defendant above and beyond any conditions required for receipt of relief through the EEOC's resolution.

Commission attorneys should take care that Commission resolutions not be associated with separately negotiated release agreements that contain any of the prohibited terms described in section C.3 above. Commission attorneys are authorized to end the EEOC's participation in efforts to resolve the EEOC's claims if the attorney learns that such rights-limiting terms are being sought in separate agreements attendant to the resolution of a Commission action, even if the EEOC is not a party to the proposed agreement containing such terms.

# F.   Relief in Systemic Cases

## 1.   Determining Monetary Entitlement

Resolution of a systemic case will often involve a settlement fund, from which monetary relief to individuals will be distributed. Individual awards for charging parties or other identified aggrieved individuals may be set out in the consent decree, or awards may be determined as part of a claims process. The scope of the class should be clearly set out in the consent decree.

In all cases, the EEOC retains sole discretion to determine eligibility to receive monetary relief and to allocate monetary relief. Where the EEOC has not yet identified all aggrieved individuals and determined their monetary awards prior to the execution of the consent decree, the decree should provide a procedure through which the EEOC will identify aggrieved individuals and determine their monetary awards. The EEOC will utilize an equitable methodology to determine apportionment of the settlement fund to aggrieved individuals. In large systemic cases, at least a general outline of the factors or formula used to determine individual shares should be set forth in the decree.

When discrimination has been inferred from a statistical disparity, backpay and instatement relief may be based on the "shortfall" in positions to which members of the affected group would have been entitled absent the defendant's unlawful conduct. Where appropriate, relief may also be based on the actual number of aggrieved individuals. The primary consideration is overall fairness to members of the affected group, individually and collectively. Exactness is not required.

## 2.   Monetary Relief for Non-Applicants in Hiring Cases

It is sometimes appropriate in hiring cases to seek relief for individuals who did not apply for the positions at issue. For example, individuals in the protected class may not have applied for a job

because of the defendant's reputation for engaging in discriminatory employment practices; or

an employer's recruitment methods may have excluded protected class members from the applicant pool. The deterred applicant theory may apply to transfer and promotion cases as well. Non-applicants should receive relief only if the EEOC is satisfied that they possessed the relevant qualifications for the positions at issue and would have applied but for the defendant's discriminatory practices.

### 3.   Instatement, Goals, and Affirmative Recruitment Efforts

In hiring, discharge, or promotion cases where aggrieved individuals cannot be immediately placed in the positions lost, they should be given the first opportunity for positions when vacancies arise. When establishing such a preference, the decree should describe with specificity the eligibility requirements and the procedure by which vacancies will be filled.

Affirmative hiring or promotion goals to increase the representation of members of a protected class may be warranted as a remedial measure where there is evidence that the protected class has been disproportionately excluded from employment opportunities. Affirmative hiring or promotion goals should be tied to the specific positions at issue in the suit, and the goals should be based on availability (determined, for example, through labor market data or applicant flow) for the position. The decree should permit the defendant to meet established goals through placements that include identified aggrieved individuals. The decree should not establish rigid quotas.

Where the decree contains hiring goals, it should also require specific affirmative recruitment efforts designed to increase representation in the applicant pool, such as the strategic placement of job advertisements and reaching out to specific organizations and educational institutions. Affirmative recruitment efforts may also be appropriate in resolutions that do not include hiring or promotion goals.

### 4.   Settlement Administration

In large systemic cases, it may be efficient to retain the services of a third party for settlement administration, usually a professional claims administrator or accounting firm, or some other business that is reliable. The cost of a claims administrator must be borne by the defendant. The consent decree should provide for EEOC assistance and involvement in the work of the claims administrator. Even where a claims administrator is involved, the consent decree must provide that the EEOC makes the final determination as to whether an individual is eligible to participate in the settlement as a claimant and the amount of the individual's award.

The consent decree should contain information about providing notice of the settlement to all individuals affected by the lawsuit. Ordinarily, notice will be sent directly to those individuals. When the issues in the case dictate, notice can also be given by other means, such as posting on the EEOC's or the defendant's website, or on a website established by the claims administrator,

advertising in periodicals, online or on social media (for instance, in a failure-to-hire case where the aggrieved individuals are not readily identifiable), distribution of the notice to employees with their paychecks, or posting the notice at the employer's facilities or in union halls.

## 5.     Reversions

No portion of the monetary relief provided for in the decree may revert to the defendant. Funds which cannot be distributed because of an inability to locate aggrieved individuals, or for any other reason, should be reallocated among identified victims. Where funds remain after reasonable reallocation efforts, they may be contributed to organizations that have the purpose of enhancing the employment opportunities of the group affected by the defendant's unlawful practices (except in EPA and ADEA actions, in which sums not paid to employees within three years are to go to the U.S. Treasury under 29 U.S.C. § 216). The program(s) or organization(s) should be selected by agreement with the defendant. Where possible, the consent decree should identify the program(s) or organization(s) to which the funds will be distributed.

---

[1]  This document was issued by General Counsel Karla Gilbride on May 21, 2024. This document contains standards and procedures adopted for the benefit of the agency and shall not be construed as creating any right or benefit, substantive or procedural, enforceable at law or in equity by third parties. This document shall not be construed to create any right to judicial review involving the compliance or noncompliance of the EEOC or its employees with any matter dealt with in it. This document is not binding on any member of the public. This document supersedes the Settlement Guidance contained in the "*Regional Attorneys' Manual,*" issued on April 29, 2005.

# EXHIBIT D

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | EEOC  FEPA | **471-2022-00779** |

| **Michigan Department Of Civil Rights** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*  Mr. Asher Lucas | Home Phone ▇▇▇▇▇ | Year of Birth |
|---|---|---|

Street Address

▇▇▇▇▇▇

CLARKSTON, MI 48346

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name  CULVER?S | No. Employees, Members  Unknown Number Of Employees | Phone No. |
|---|---|---|

Street Address

6910 Sashabaw Road

CLARKSTON, MI 48348

| Name | No. Employees, Members | Phone No. |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

| DISCRIMINATION BASED ON  Sex | DATE(S) DISCRIMINATION TOOK PLACE  Earliest          Latest  05/08/2021          11/11/2021 |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.  **Digitally Signed By: Mr. Asher Lucas**  **02/15/2022**  *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT  SUBSCRIBED  AND  SWORN  TO  BEFORE  ME  THIS  DATE  *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br><br>FEPA | **471-2022-00779** |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

I began working for the above-named employer on or about May 08, 2021. I was last employed as a Shift Leader. Throughout my employment, I was subjected to harassment by a coworker due to my transgender identity. On or about November 11, 2021, I complained to management about the harassment. On or about November 12, 2021, I was fired. I believe I was discriminated against due to my sex, gender identity, and in retaliation for engaging in a protected activity in violation Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Mr. Asher Lucas**<br>**02/15/2022**<br><br><br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT E



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Detroit Field Office

477 Michigan Avenue, Room 865
Detroit, MI 48226
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Detroit Direct Dial: (313) 774-0020
FAX (313) 226-2778
Website: www.eeoc.gov

Charge No.: 471-2022-00779

Asher Lucas
████████████

Charging Party

Culver's
6910 Sashabaw Road
Clarkston, MI 48348

Respondent

## <u>DETERMINATION</u>

Under the authority vested in me by the Commission's Procedural Regulations, I issue the following determination on the merits of this charge.

The Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, and timeliness, deferral and all other requirements for coverage have been met.

The Charging Party alleged that he was subjected to harassment due to his gender identity and discharged in retaliation for participating in protected activities in violation of Title VII of the Civil Rights Act of 1974, as amended ("Title VII").

Evidence gathered during the investigation indicates that the Charging Party was subjected to ongoing harassment due to his gender identity and discharged in retaliation for participating in protected activity at the Respondent's Clarkston, Michigan facility, in violation of Title VII. In or around November 2021, the Charging Party was subjected to repeated misgendering and comments about his gender identity. Respondent knew or should have known of the harassment but failed to take prompt remedial action to stop the harassment. On or about November 11, 2021, the Charging Party complained about the harassment to the Respondent. The next day, the Charging Party was terminated. Evidence revealed that the legitimate, nondiscriminatory reasons articulated by the Respondent are pretexts to hide retaliation.

Like and related and growing out of the investigation, the evidence revealed a class of individuals who were also discharged on or around November 2021 for opposing or complaining of the harassment. Respondent's alleged reasons for discharging other individuals were not substantiated in the investigation.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation, conference, and persuasion.

Having determined that there is reasonable cause to believe that violations have occurred, the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter.  If you wish to participate in conciliation, please email Investigator Tina Griffin at tina.griffin@eeoc.gov within 10 days from the date of this Determination. The confidentiality provisions of the statute and Commission Regulations apply to information discussed or given during conciliation.

When the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons, and the Commission.

On Behalf of the Commission:

_____                                         *For* _____
Date                                                                    Michelle F. Eisele
                                                                            District Director